# Illinois Official Reports

## Appellate Court

---

*In re Marriage of Moorthy*, 2015 IL App (1st) 132077

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF DEEPALAKSHMI MOORTHY, Petitioner-Appellant, and CHANNA MALLIK ARJUNA, Respondent-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-2077 |
| Filed | March 13, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 02-D-13868; the Hon. Naomi H. Schuster, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | August Staas, of Chicago, for appellant.<br><br>Law Office of Annette M. Fernholz, P.C. (Annette M. Fernholz and Nicole McKinnon, of counsel), and Badesch Abramovitch, both of Chicago, for appellee. |

| Panel | PRESIDING JUSTICE PALMER delivered the judgment of the court, with opinion. |
| | Justices Gordon and Reyes concurred in the judgment and opinion. |

## OPINION

¶ 1     In June 2003, the trial court entered a judgment dissolving the marriage of petitioner, Deepalakshmi Moorthy, and respondent, Channa Mallik Arjuna. In May 2011, Moorthy filed a petition to modify the amount of child support Arjuna paid for their daughter. Following an evidentiary hearing, the trial court entered an order on May 29, 2013, in which it increased the amount of child support based on Arjuna's current yearly salary, but the trial court held that Arjuna's proportionate share of the retained earnings from his majority-owned subchapter S corporation should not be imputed to him for purposes of calculating his child support obligation. Moorthy appeals that order, contending that the proportionate share of the retained corporate earnings should be included in Arjuna's net income in calculating Arjuna's child support obligation. We affirm.

¶ 2                              I. BACKGROUND[1]

¶ 3     The parties married in December 2000 and, as noted, had one child, Seema Lakshmi Arjuna, born in March 2002. Moorthy filed a petition for dissolution of marriage on August 27, 2002. The parties do not dispute that the trial court entered a default judgment for dissolution of marriage on June 5, 2003. It awarded sole custody of the minor to Moorthy and ordered Arjuna to pay $480 in monthly child support based on 20% of his average net monthly income of $2,401 as an employee of Mahantech Corp. (Mahantech), a company located in West Virginia. The parties were ordered to share equally any medical expenses not covered by Moorthy's insurance. At the time, Arjuna lived in West Virginia and he continues to reside there, although he subsequently remarried and has one child with his current wife, and a stepchild. Moorthy and Seema have lived in metropolitan Chicago since the filing of the petition for dissolution.

¶ 4     On May 26, 2011, Moorthy filed a petition to increase child support pursuant to section 510 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/510 (West 2010)) asserting that a substantial change in circumstances occurred. In the petition, Moorthy argued that, as eight years had passed since the judgment of dissolution was entered, the minor child, who was now nine years old, had increased needs, and Arjuna's income had also

---

[1]Initially, we note that Arjuna requests that we strike Moorthy's statement of facts in her opening brief as being argumentative and inaccurate. Illinois Supreme Court Rule 341(h)(6) requires that an appellant's statement of facts provide an accurate and fair recitation of the pertinent facts without argument or comment. Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013). This court may strike a statement of facts where it fails to comply with this rule. *Szczesniak v. CJC Auto Parts, Inc.*, 2014 IL App (2d) 130636, ¶ 8. Having reviewed Moorthy's statement of facts and the record and report of proceedings in this case, we do not find that it contains any such egregious inaccuracies as to hinder our review or warrant the harsh sanction of striking it. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 15.

increased. Moorthy requested that the court order Arjuna to pay increased child support, to pay half of the medical insurance for the minor, and to pay a reasonable portion of Moorthy's daycare expenses. Arjuna filed a response on July 8, 2011, and the parties engaged in discovery. An evidentiary hearing was conducted on April 5, 2012, and May 22, 2012, at which Moorthy and Arjuna testified.

¶ 5                                        A. Arjuna's Testimony

¶ 6        Arjuna was called to testify by Moorthy as an adverse witness. Arjuna testified that he lives in Charleston, West Virginia, with his current wife, their son, and a stepdaughter. In 2003, when the dissolution judgment was entered, Arjuna earned a salary of approximately $45,000 as an employee of Mahantech, which is a software consulting and networking services business. Arjuna testified that Mahantech was incorporated in Delaware in 1997 or 1998, and a distant relative, Gorli Hjrash, purchased the company from the original owners. Arjuna explained that the company was losing money and was going to be shut down, but Arjuna decided to buy it so that he could take over and run the corporation. He obtained 38% ownership in 2006. He did not pay anything for the ownership share because the company "was completely negative" and about to be shut down, and because he had been with Mahantech since 1999. In 2007, he acquired 91% of Mahantech, with the remaining 9% owned by Hjrash. Arjuna paid $500 for the 91%. He also testified that loans were taken out for the business, but he did not know whether he personally guaranteed them. He testified that he believed it was less than $200,000, but this had since been paid off.

¶ 7        Arjuna explained that because Mahantech is a subchapter S corporation, it does not pay federal corporate taxes on its income. Instead, he receives a schedule K-1 form from the company as one of the owners. His federal tax return for 2007 showed K-1 income of $108,433, but he testified that this amount was the K-1 income from Mahantech. He explained that this amount was not money that he actually took home. He testified that the money "stays in the company" and that "[t]he company paid the tax" under his name. Arjuna testified that an accountant handles Mahantech's taxes. He indicated that his accountant calculates the taxes owed from Mahantech's income and the taxes are paid by Mahantech but under Arjuna's name since the subchapter S corporation does not pay taxes. He testified that his accountant logs on to Mahantech's online account with the Internal Revenue Service (IRS) and inputs the amount of money owed, and the money is paid out of Mahantech's bank account. Arjuna conceded that the taxes owed for Mahantech's income were his liability and not the corporation's liability. He testified that the "S corporation cannot pay the taxes. It has to be paid by the owner of the corporation." Arjuna testified that he includes the corporation's K-1 income on his personal tax return and the amount shown as total taxes owed on his tax return included the tax on Mahantech's income. He testified that on his W-2 form, he received $50,000 in gross income and he paid taxes on that as well. His individual tax return also showed that his wife had income of $31,759 as a database administrator and income of $35,000 as a contractor for other companies. She was previously employed by Mahantech, but she left when Arjuna bought the company because he did not want family to be involved. However, she occasionally did some contract work for the company.

¶ 8        Similarly, for 2008, Arjuna testified that his tax return showed that he earned a salary of $50,000 with K-1 income of $91,071. Arjuna testified that the 2008 corporate tax return for Mahantech showed business income of $102,000.

¶ 9        In 2009, Arjuna's tax return showed that he again received a salary of $50,000. He testified that the 2009 corporate tax return for Mahantech showed ordinary business income of $129,634. Thus, $117,967 was attributed to Arjuna for his 91% share. Arjuna testified that on his 2009 schedule K-1, it showed a nontaxable distribution of $211,077. Arjuna testified that under state tax law in West Virginia, a company pays a 2% tax on any money in its bank account as of the last business day of the year. Therefore, his accountant advised Arjuna to take the money out of Mahantech's account on the last business day of the year and then put the money back into the account on the first business day of the next year in order to avoid paying this tax. Arjuna explained that he obtained a cashier's check for the amount, he did not deposit it in his own account or anywhere else, and he redeposited the same cashier's check into the corporation's account on the first business day of the next year. Arjuna therefore held the cashier's check in his possession for approximately 48 hours.

¶ 10       With respect to 2010, Arjuna testified that his K-1 income from Mahantech was $117,281. The 2010 tax return for Mahantech showed ordinary business income of $129,119. As in 2009, the 2010 return also showed a distribution of $116,000, and Arjuna testified that he repeated the same action–taking out the amount in the Mahantech account at the end of the year in a cashier's check and then redepositing the same check back into the corporate account in the new year.

¶ 11       Arjuna testified that his W-2 form from 2011 showed that he received a salary of $50,000. He testified that he was unsure whether he would receive the same salary in 2012 because business was down, and he would pay his employees before himself. A paystub from March 31, 2012, showed he earned a monthly income of $4,166.67. He testified that in 2011, Mahantech showed ordinary business income of only $25,429, which was significantly less than in prior years. The schedule K-1 form for 2011 showed income attributed to him in the amount of $21,105. Arjuna also testified that he went through the same procedure as in prior years in obtaining a cashier's check for the amount in Mahantech's bank account on the last business day of the year and redepositing the amount back into the account in the new year. He testified that he believed that Mahantech's bank account had a balance of approximately $220,000 on the last day of 2011.

¶ 12       Arjuna agreed that in the years 2007, 2008, 2009, and 2010, the corporation's earnings were greater than its expenses. Arjuna testified that he has never taken any money out of Mahantech other than for his salary and to pay taxes, except that in 2010, he took approximately $7,000 out to buy a plane ticket to visit his family in India because of a family emergency and he did not otherwise have the money to purchase the flight. He testified that the corporation currently had no debt, but the company was in the negative when he became owner and he was trying to make sure that all the corporation's obligations were met.

¶ 13       He testified that his salary was decided by the owners when he bought the company. When asked if he could increase his salary to $60,000, he testified that he could not because Mahantech "needs the working capital. If I had to take the money from the payroll, I cannot. *** It is a small company. Every penny counts in the company." He testified that with the $50,000 salary he receives, he was "living a very simple, I could say loyal [*sic*] middle class level of living because I am devoting myself towards this to give a better life for my kids." He testified that he does "have a lot of issues. I want this or that, but I have to sacrifice to make something good for the family and the future."

¶ 14    Arjuna testified that Mahantech needed sufficient funds to support payroll and to pay employee taxes, unemployment taxes, health benefits, business liability insurance, worker's compensation insurance, business auto insurance, business theft insurance, and accounting and tax expenses. The various insurance policies that Mahantech required, such as worker's compensation insurance and business auto insurance, cost approximately $15,000 every year.

¶ 15    Arjuna testified that he had five salaried employees who work as programmers on-site with clients to help with computer network problems. He testified that Mahantech had approximately $50,000 to $60,000 in employee salary requirements per month. He provided the following examples of current employee contracts to which Mahantech was bound: (1) a contract for 2012 at a rate of $12,800 per month; (2) a contract with a 40-hour-per-week requirement and a salary of $70,000; (3) a contract for $5,000 per month; (4) a contract to pay an employee $12,809.55 per month; (5) a contract for $4,000 per month; (6) a contract for $61 per hour, plus benefits; (7) a contract to pay an hourly rate of $75 per hour; and (8) a contract to pay $5,000 per month, plus benefits. Arjuna testified that Mahantech had to pay the salaries for employees under these contracts regardless of whether it had a project for them to work on. Arjuna did not have a contract for himself as an employee; he was the only "at-will" employee.

¶ 16    With regard to Mahantech's expenses and deductions as reflected on the corporation's tax returns, Arjuna testified that, in 2008, the gross sales for Mahantech totaled $1,512,738. The company paid salaries and wages in the amount of $551,621. There was a deduction for $517,829, which represented professional fees, accounting fees, legal fees, work visa expenses, and consulting expenses. Mahantech's employees were "H1B" employees who were in the United States on work visas, and obtaining and maintaining these visas comprised a significant expense to Mahantech. The legal expenses were incurred for managing the work visas and for applying to a federal minority certification program. Mahantech also had to pay filing fees for the work visas, which were $1,000 to $3,000 each time something had to be filed, such as when an employee changed client locations. Mahantech also filed applications to sponsor all of its employees, except one, to obtain a three-year extension on their work visas, which last for six years, and to obtain green card applications, which were approved. He testified that if Mahantech is not able to find a project within a reasonable time period, it was the company's responsibility to send the employee and his family back to his home country and pay travel and relocation expenses. He denied that he could lay off his work visa employees if there was no work for them. He testified, "I cannot lay them off. One thing, if I lay them off, I have to–the company has to pay the money for that employee and that employee's spouse and everybody to send back to their home country." Also, even if Mahantech was one day late in paying payroll, the employees could report Arjuna to the immigration service as he would be violating federal regulations.

¶ 17    In addition, Arjuna testified that Mahantech paid a large amount of money for consulting or contract work to another company for that company's employees to work on Mahantech's projects with Mahantech's clients. Arjuna testified that he currently was not using any contract or consultant labor. He testified that his clients prefer his permanent employees instead of contract workers because they were more likely to stay for the duration of a project.

¶ 18    He testified that Mahantech currently had five contracts with other companies. He testified that the clients typically pay Mahantech monthly; he sends an invoice at the end of the month, and once billing rates are agreed on, the client takes 15 to 30 days to pay. He testified that "[m]ost of the time I get paid on time," but sometimes a client delays payment, and in that case,

Mahantech still had to cover its payroll and other expenses while waiting to receive the client's payment. Arjuna testified that two contracts with customers would end in 2012 and that "this last year was getting worse" and Mahantech "may end up negative" or with only a few thousand dollars.

¶ 19 Arjuna explained that Mahantech's gross receipts decreased in 2011 because a few contracts with one local company, Technology Solutions, ended in 2010. He testified that Technology Solutions comprised 60% or more of Mahantech's business in 2010, but less than 5% of its business in 2011, and none of its business in 2012. Technology Solutions, in turn, did business with a worker's compensation insurer, but the insurer's business decreased drastically after a state-run provider entered the market.

¶ 20 Arjuna also testified that, in the interim between the hearing dates in this case, another one of the five remaining contracts for Mahantech expired and was not renewed. Arjuna did not yet have a new project for the employee who had worked on the project that ended, but Mahantech had to continue paying him, and this money came from its retained earnings.

¶ 21 Arjuna testified that in an effort to increase business, Mahantech became involved in a federal program for economically and socially disadvantaged minority business owners called section "8(a) certification," which designated federal money for awarding contracts to minority-owned companies. It took him two years to obtain the certification. To qualify, the company was required to be in business for more than three years and be profitable, and the majority owner of the company was required to have a net worth of less than $250,000. Arjuna testified that to remain in the program, he had to improve the business and infrastructure and possibly hire someone to handle writing requests for proposals for the federal projects. The Small Business Administration monitors the company; Arjuna must submit information quarterly and provide a yearly business plan. The program also restricted Arjuna from taking out more than $200,000 or $250,000 as a bonus or salary from the company. Arjuna incurred expenses attending conferences as part of the federal program. Mahantech had not yet been awarded any federal contracts.

¶ 22 When asked if, as the 91% owner, he was the one who makes decisions for Mahantech, Arjuna testified that "according to the company bylaws, I still need to have my other partner to come to a final decision." He testified that under the bylaws, he "cannot make 100 percent decision. *** I need to consider the other partner." He testified that he "still need[s] to contact him [Hjrash], and I need to talk and explain what I'm doing." When asked whether he could outvote Hjrash if they had a disagreement, Arjuna answered, "Yes." However, upon subsequent questioning by Moorthy's counsel, Arjuna denied that he was restricted in his ability to make distributions to himself because of the minority shareholder. He testified, "Not the minority shareholders. Obligations and–obligations of the business activity. Business needs the money to support the employees."

¶ 23 Regarding his financial disclosure statement that he submitted in this case, Arjuna testified that he had $169.47 left each month after paying all of his bills. Regarding Moorthy's request that Arjuna contribute to Seema's health insurance, he testified that if it was possible to add her to his wife's policy through her state employment, he did not have a problem including her on the policy.

¶ 24                                B. Moorthy's Testimony

¶ 25        Moorthy testified that she was a software architect and had her own consulting company called Kanvig Tech Solutions. She was the only employee. Moorthy testified that, as a single mother, she needs a flexible work schedule and she tries to work 40 hours per week, but sometimes she works less, and she could go two months without having a job or contract lined up. Because she is raising Seema, she restricts herself to working only in the Chicago area.

¶ 26        Moorthy testified that Seema was 10 years old at the time and in fourth grade. Seema attends a public school in Chicago and the school day ends at 1:45 p.m. Moorthy does not have family living close enough to her to assist with child care on a daily basis. As a result, Moorthy has to find daycare for her between that time and 6 p.m. During the school year, she sends Seema to daycare at the school, which costs approximately $450 to $500 per month. How much she pays varies depending on how many school days or days off there are in a given month. For example, Moorthy testified that she paid $387 for May 2012. Moorthy testified that when she is not working, Seema still attends daycare because Moorthy pays for the school daycare ahead of time, a job interview for Moorthy may arise, and Moorthy does not want to change Seema's schedule.

¶ 27        When there is no school and during the summer, Seema goes to a different daycare or Moorthy obtains a nanny. Every other summer, Seema stays with Moorthy's parents in India. Moorthy testified that she paid the nanny she hired in the summer of 2011 a rate of $7 per hour, and she took care of Seema 10 hours per day during the summer, which totaled $350 per week, for approximately two months. Moorthy testified that the nanny usually charges $14 or $17 per hour, but charged Moorthy less because she "knows my situation." Moorthy testified that during Seema's previous spring break, she could not afford to pay for daycare, so she sent Seema to stay with Moorthy's brother who lives in Michigan. Moorthy testified that since the petition to modify support was filed, she has spent approximately $3,500 on school-provided daycare, and $6,000 for other, alternative daycare. However, Moorthy also later testified that her 2010 tax return listed child care expenses in the amount of $2,492. Moorthy explained that this included only the cost of school daycare. She conceded that her previous testimony that she paid $3,500 for school daycare was erroneous.

¶ 28        In addition, Moorthy testified that Seema participates in the following classes or lessons: (1) swimming ($100 per month); (2) Kumon classes in math and English ($195 per month); (3) chess ($300 per month); (4) Robot City ($300 per semester); (5) violin ($150 per semester); (6) dance; (7) guitar ($150 per semester); and (8) kickball ($175 per semester). Moorthy explained that her education in India was "totally different" than Seema's education in the United States, "so I [Moorthy] feel like she's not up to the competency level that I was like–the country that I'm coming from." Moorthy explained that she has "talked to other Indian families, like whatever they are doing, that's what I will be usually doing with my daughter also." She testified that Seema was doing fifth-grade subjects and she was in the gifted program at school, but "still she's not challenged." Seema attends Kumon classes every Monday and Wednesday all year. The classes for chess, robotics, and music are offered at the school and occur when Seema is at the school daycare between 1:45 and 6 p.m., but Moorthy still has to pay the cost of the daycare in addition to the cost of the classes. Moorthy testified that Seema's swimming, Kumon, and Indian dance classes occur on the weekends or evenings, separate from school. Moorthy testified that Seema has been doing these activities for many years and Moorthy has paid for them. When asked if she contacted Arjuna before deciding to enroll Seema in all of

these activities, Moorthy responded, "No, I didn't because when I contacted, I mean the previous years, he had never returned call to–like all I was asking him is to talk to her. He reject [*sic*] her–like completely he reject her."

¶ 29    Moorthy also pays for health insurance for Seema, which costs $100 per month and carries a $7,500 deductible, although she later testified that her financial disclosure statement submitted in this case indicated that she pays $263 per month for Seema's health insurance.

¶ 30    Regarding her tax returns, Moorthy testified that in 2010, her company's gross receipts were $128,600. She testified that her 2010 income including her W-2 and business income totaled approximately $100,000. She received a salary of $30,000 on her W-2 form. With respect to the remaining amount of business income of $67,529, Moorthy testified that she invested it in Seema and was trying to give her a better life. Moorthy testified that she believed her company tax return for 2011, which was not yet prepared at the time of the hearing, would show income of approximately $112,000.

¶ 31    Moorthy testified that she took the following deductions on her tax return: $49,895 for automobile expenses for gas to traveling to different jobsites in the Chicago area and for repairs; $3,114 for medical insurance; deductions for telephone and Internet expenses in connection with her business for her cellular telephone, home telephone, fax number, and Internet connection; a deduction for utilities related to the use of her home office; and a deduction for officer health insurance in the amount of $4,653, which she described as "my health insurance. Probably that other insurance is just to do with the company."

¶ 32    Moorthy testified that in addition to the house she currently lives in with Seema, she also owns a house in Lake in the Hills, Illinois, which she rents out at $1,075 per month, and it was currently occupied. She testified that she has a mortgage on that house and pays $200 extra per month for association fees. She also has a mortgage on the house in which she currently lives.

¶ 33    With respect to her financial disclosure statement submitted in this case, Moorthy testified that it listed her monthly income as $7,350, which would include her salary and a monthly distribution from her company's income. It listed expenses for utilities, telephone, and a cleaning service for her home. She listed a $200-per-month expense for furniture and appliance repair and replacement, which she explained represents such expenses as purchasing a new sofa approximately every three years, painting her daughter's room, and purchasing her daughter a new desk when she grows out of her old one. She also listed a $200-per-month expense for repairs and maintenance to the property, and testified that, for example, it could be to fix pipes, or for maintenance or repair of the heat and electricity. She recently had to replace the dishwasher. She listed $325 for gasoline in driving Seema to various classes. She listed a $50 expense for books because Seema "loves to read, so we'll be like buying some books for her all the time." Moorthy listed a $150 expense for school lunches for Seema. She also listed $500 for medical expenses and Moorthy explained that she set aside $500 a month for Seema's deductible because of medical issues. Moorthy testified that her disclosure statement showed that she was $3,910 "in the red" for each month. Moorthy explained that to cover this discrepancy, she "will be pulling that from the company" instead of saving or reinvesting her company's income to grow the business.

¶ 34    Following the hearing, Moorthy submitted a written memorandum in support of her petition. She asserted that, as defined in section 505 of the Act (750 ILCS 5/505 (West 2010)), "net income" should include Arjuna's proportionate share of Mahantech's retained earnings because he had control over whether the corporation's earnings were distributed, he identified

no business purpose for not distributing the earnings, and he also took cashier's checks from Mahantech at the end of each year, even though he did not cash them. Taking into account his proportionate share of the retained earnings and his W-2 salary from 2007 through 2011, Moorthy asserted that his average net income was $106,361 and his child support should be $1,772.68 per month.

¶ 35                                    C. The Trial Court's Ruling

¶ 36    The court issued a written opinion on May 29, 2013. The parties and trial court agreed that there was no Illinois case directly on point regarding whether retained earnings of a closely held corporation should be included in a supporting parent's income. Based on cases cited by the parties and the court from other jurisdictions, the trial court determined that the following factors were relevant in deciding whether the retained earnings of a closely held corporation constitute income for purposes of calculating a parent's child support obligation: (1) whether the party was the sole shareholder, (2) whether the party was manipulating income, (3) whether the retained earnings were excessive, and (4) whether there was a legitimate business purpose for not distributing the retained earnings. Reviewing the testimony, the trial court held that Arjuna was the 91% shareholder, earned a salary of $50,000, lived a frugal lifestyle, and had not distributed any earnings (other than for the plane ticket to India). The court found that the retained earnings were necessary to meet the company's payroll of six employees, overhead, immigration costs, the section 8(a) certification program, and insurance policies that were required and necessary for the company's stability. The court noted that the company lost a major contract, but was still required to pay the salaries of its employees or pay to relocate an employee to his home country, and this testimony had not been challenged by Moorthy. In addition, the court held that Arjuna owed a fiduciary obligation to the minority shareholder to act in the best interests of the corporation. The court found that Arjuna had articulated a legitimate business purpose for not distributing the earnings. The court found no evidence that Arjuna manipulated his income in order to reduce his child support obligation, as his W-2 form reflected the same salary of $50,000 per year since 2007. The court specifically held that Arjuna "testified credibly that he is not keeping the retained earnings in the company for any reason other than a legitimate business purpose." The court noted that there was no testimony that the amount of retained earnings was excessive. Based only on his W-2 wages of $50,000, the court determined Arjuna's child support obligation should increase to $643 per month, retroactive to the date of filing the petition. In addition, the court held that Moorthy was to continue to be solely responsible for the costs of daycare for Seema, as she was "in a far superior position to support the day care arrangements, as she deems necessary based upon her work schedule and the activity schedule that she has selected [for] Seema without consultation with Arjuna." Lastly, the court determined that the parties were to share the medical insurance costs for the minor equally and ordered Arjuna to pay half of the medical insurance premiums for the minor child, retroactive to the date of filing the petition.

¶ 37                                    II. ANALYSIS

¶ 38    Section 505(a) of the Act gives the trial court authority to order a parent to pay " 'an amount reasonable and necessary for [the] support' of the child." *Mayfield v. Mayfield*, 2013 IL 114655, ¶ 16 (quoting 750 ILCS 5/505(a) (West 2010)). The court must first determine the parties' income and then apportion that income to set the amount of child support paid by the

noncustodial parent. *Id*. A party's "net income" under the Act is defined broadly as the " 'total of all income from all sources,' " minus various specified deductions. *In re Marriage of Rogers*, 213 Ill. 2d 129, 136-37 (2004) (quoting 750 ILCS 5/505(a)(3) (West 2002)). Although the Act does not define "income," the supreme court in *Rogers* observed that it is defined in the dictionary as " 'something that comes in as an increment or addition \*\*\*: a gain or recurrent benefit that is usu[ally] measured in money \*\*\*: the value of goods and services received by an individual in a given period of time.' " *Id*. at 136-37 (quoting Webster's Third New International Dictionary 1143 (1986)). In addition, it is also defined as " 'money or other form of payment that one receives, usu[ually] periodically, from employment, business, investments, royalties, gifts and the like.' " *Id*. at 137 (quoting Black's Law Dictionary 778 (8th ed. 2004)). As such, "income" for purposes of child support determinations may include "a variety of payments [that] will qualify as 'income' for purposes of section 505(a)(3) of the Act that would not be taxable as income under the Internal Revenue Code," which is designed to achieve different purposes than the child support provisions of the Act. *Id*. Accordingly, income includes "gains and benefits that enhance a noncustodial parent's wealth and facilitate that parent's ability to support a child or children," which are "normally linked to employment or self-employment, investments, royalties, and gifts." *Mayfield*, 2013 IL 114655, ¶ 16 (citing *In re Marriage of Rogers*, 213 Ill. 2d at 136-37).

¶ 39        Having determined a party's net income based on these parameters, the court must then determine the amount of child support; the guidelines provide that the minimum amount for one child is "20% of the supporting party's net income." *Mayfield*, 2013 IL 114655, ¶ 17 (citing 750 ILCS 5/505(a)(1) (West 2010)). Section 505 "creates a rebuttable presumption [that] the specified percentage of a noncustodial parent's income represents an appropriate child support award." *In re Marriage of Demattia*, 302 Ill. App. 3d 390, 393 (1999).

¶ 40        Once initially set by the trial court, a party may seek to have the child support obligation modified by showing a substantial change in circumstances pursuant to section 510 of the Act. *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 231 (2008) (citing 750 ILCS 5/510 (West 2006)). "The party seeking relief has the burden of showing a change in circumstances substantial enough to warrant a change in support. [Citation.] A change in income is one of the grounds for modification." *Id*. The relevant focus of this inquiry is " 'the parent's economic situation at the time the child support calculations are made by the court.' " *Id*. (quoting *In re Marriage of Rogers*, 213 Ill. 2d at 138). The rebuttable presumption that child support which conforms to the guidelines is appropriate is also applicable in modification proceedings. *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 28.

¶ 41        In analyzing a trial court's determination on appeal, we are mindful that "modification of a child support order lies within the trial court's discretion, and we will not disturb its decision absent an abuse of discretion." *In re Marriage of Heldebrandt*, 301 Ill. App. 3d 265, 267 (1998). " 'The findings of the trial court as to net income and the award of child support are within its sound discretion and will not be disturbed on appeal absent an abuse of discretion.' " *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 22 (quoting *In re Marriage of Breitenfeldt*, 362 Ill. App. 3d 668, 675 (2005)). The trial court abuses its discretion if "no reasonable person would take the trial court's view." *In re Marriage of Eberhardt*, 387 Ill. App. 3d at 233. Further, we "allow the trial court's factual conclusions to stand unless they are against the manifest weight of the evidence." *Id*. " 'A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be

unreasonable, arbitrary, or not based on evidence.' " *Id*. (quoting *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995)).

¶ 42    While Moorthy argues solely for a *de novo* standard of appellate review, this standard applies only to issues of statutory interpretation and "when there are no factual or credibility issues" and only questions of law remain. *In re Marriage of Eberhardt*, 387 Ill. App. 3d at 231 (citing *In re Marriage of Crook*, 211 Ill. 2d 437, 442 (2004), and *In re Marriage of Rogers*, 213 Ill. 2d at 136-37). Therefore, to the extent the trial court interpreted the Act and made rulings of law, we review those portions of its decision *de novo,* but the trial court's determinations regarding net income and child support will be reviewed under the more deferential abuse of discretion standard.

¶ 43    Moorthy contends that the touchstone consideration of whether to include retained subchapter S corporation earnings as income is whether the obligated party has control over the distribution of the funds at issue. Moorthy highlights the fact that the allowable deductions or exceptions from "net income" contained in section 505(3) all involve matters over which the supporting party does not have control, such as mandatory retirement contributions, insurance premiums mandated by court order, and payments for debts previously incurred. 750 ILCS 5/505(3) (West 2010).

¶ 44    As explained in *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 820-21 (2007):

> "A subchapter S corporation is a pass-through entity utilized for federal tax purposes. [Citation.] Unlike a subchapter C corporation, [a subchapter S corporation] does not pay corporate-level taxes on its income. Instead, the corporation's income is taxed directly to its shareholders based on their ownership of corporate stock, whether or not the income is actually distributed to the shareholders. See I.R.C. §§ 1361 through 1379 (2000) (defining and explaining subchapter S and subchapter C corporations). A subchapter S corporation monitors its retained corporate earnings using an account which is then used to determine each shareholder's basis for taxed but undistributed corporate income. However, retained earnings and profits of a subchapter S corporation are a corporate asset and remain the corporation's property until severed from the other corporate assets and distributed as dividends. [Citation.]"

¶ 45    As the parties and the trial court recognized, no Illinois case law directly on point exists in this matter. The parties and the trial court relied on Illinois cases involving the related questions of whether other types of income constitute "income" for child support purposes and whether retained corporate earnings constitute marital property, which we review below. We note that these cases are inapposite as they deal with the question of whether retained earnings constitute marital property and not whether retained earnings should be imputed as income for purposes of calculating child support. However, we discuss them below because they were cited and discussed by the trial court and the parties for analogous purposes. We also review the cases cited by the parties and the trial court from foreign jurisdictions that analyzed whether retained corporate earnings can be attributed to a parent for child support purposes.

¶ 46                    A. Illinois Case Law–Retained Earnings and Marital Property

¶ 47    In the case of *In re Marriage of Joynt*, 375 Ill. App. 3d at 820, the Third District of the Illinois Appellate Court held that the retained earnings of a closely held subchapter S corporation in which the husband owned 33% of the stock constituted nonmarital property. The court reasoned that the husband held a minority percentage of the shares, he was not a

- 11 -

controlling shareholder, and he could not have unilaterally declared a dividend. *Id*. Although the income was taxed to the shareholder, the subchapter S corporation ultimately paid the taxes via year-end payments to the husband. *Id*. at 821. Expert witness testimony indicated that the retained earnings were used for corporate expenses, the husband's compensation was "reasonable and fair," and there was no evidence to support that he used retained earnings to shelter marital income. *Id*.

¶ 48　　On the other hand, this court in *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 497 (2009), found that the retained earnings of the husband's subchapter S corporation constituted marital property under the Act. The *Lundahl* court utilized the factors identified in *Joynt* in its analysis, that is, the nature and extent of the spouse's stock holdings, whether the spouse had the authority to distribute the retained earnings, and the extent to which retained earnings were considered in the value of the corporation. *Id*. at 503 (citing *Joynt*, 375 Ill. App. 3d at 819). The court pointed out that, unlike in *Joynt*, the husband in *Lundahl* wholly owned the corporation and was the sole shareholder and, therefore, could unilaterally declare dividends. *Id*. at 503. The court held that the retained earnings therefore constituted the husband's income and were not assets of the corporation. *Id*. Further, the court held that, unlike in *Joynt*, the company's earnings were not retained to pay expenses or used in connection with the corporation, and they were taxed to the husband, who paid taxes on the earnings. *Id*. at 504.

¶ 49　　　　　　　　B. Illinois Case Law–Net Income and Child Support

¶ 50　　In the case of *In re Marriage of Rogers*, 213 Ill. 2d at 137-39, our supreme court concluded that yearly gifts that the father obligor received from his parents constituted income for purposes of calculating his child support obligation under the Act, even though such gifts may not be forthcoming in subsequent years.

¶ 51　　In the case of *In re Marriage of McGrath*, 2012 IL 112792, ¶ 14, our supreme court held that net income did not include money that an obligor parent withdraws from a savings account that was owned by the obligor.

¶ 52　　This district concluded in *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 52, 56-57 (2008), that the proceeds from the sale of the father obligor's residence did not constitute income for child support purposes because he used it to purchase a new residence and the sale was necessitated by him losing his job and relocating to where he obtained employment.

¶ 53　　The Second District of the Illinois Appellate Court held in *Ivanyi v. Granoff*, 171 Ill. App. 3d 411, 421 (1988), that the father obligor's interest, dividends, and capital gains were not part of his net income even though he reported them on his federal taxes because he did not actually or constructively receive the income.

¶ 54　　The Second District held in *In re Marriage of Harmon*, 210 Ill. App. 3d 92, 95-96 (1991), *overruled on other grounds in In re Marriage of Rogers*, 213 Ill. 2d at 139, that the monthly interest payments the mother obligor received should not be included in her net income for child support purposes as they comprised her share of the marital assets and constituted passive income not actually received, regardless of how they were reported for tax purposes. The court noted that the obligor mother had health problems and the father had adequate financial resources to support the children alone. *Id*. at 97.

¶ 55　　The Second District also held in *In re Marriage of Tegeler*, 365 Ill. App. 3d 448, 458 (2006), that an annual loan the father obligor received for running his farm was not part of his

net income. The father's tax return showed itemized totals of expenses and his accounting books contained detailed lists of expenses, which established a *prima facie* showing that the expenses were legitimate, and the mother failed to rebut this. *Id*. at 456.

¶ 56                     C. Foreign Jurisdictions–Retained Earnings and Child Support

¶ 57        Of particular usefulness to our analysis is *In re Marriage of Brand*, 44 P.3d 321 (Kan. 2002), from the Supreme Court of Kansas.[2] In *Brand*, the mother filed a motion to modify child support, seeking to include in the father's income distributions from several subchapter S corporations of which the father was a minority shareholder. *Id*. at 323. The subchapter S corporation only distributed the amount necessary each year to reimburse its shareholders for their share of the corporation's tax liability and the father could not declare a distribution independently of the other shareholders. *Id*. at 324. The applicable state statute provided that a parent's income included regularly and periodically received income from any and all sources, which included self-employment gross income after reasonable business expenses. *Id*. at 326. The court noted that earnings of subchapter S corporations were owned by the corporation, not the shareholders, and corporations were not required to distribute the income. *Id*. at 325. As a matter of first impression, the court turned to cases from other jurisdictions, finding that most courts do not rely solely on tax returns to determine the amount of income available for support and that "[t]here is no presumption that an individual's share of a Subchapter S corporation's income should be included as income for purposes of calculating child support. Individual inquiry on a case-by-case basis is necessary to ensure that the appropriate amount of income is considered 'received' ***." *Id*. at 328. In refusing to adopt a blanket rule regarding the inclusion of retained earnings in calculating support, the *Brand* court observed that "[a] corporation must sometimes necessarily retain profits, not everyone stands in a position to force distribution of a corporation's profits, and not all distributions to shareholders increase their ability to pay support." *Id*. at 330. The court concluded that deciding how to characterize corporate earnings and distributions and whether to deduct ordinary and necessary business expenses from those earnings were both "highly fact specific" inquiries. *Id*. Of the many factors to consider, the analysis should include the proportion of the shareholder's ownership in the corporation, whether the shareholder could control distribution or retention of the business's profits, and the "past earnings history of the corporation." *Id*. Significantly, "[i]n those cases where income can be manipulated because of the ability to control distributions, heightened scrutiny should be exercised." *Id*. The court held that, as a minority shareholder, the father was less able to control retained earnings or distributions, and the mother failed to show that he manipulated corporate assets or otherwise shielded his income to avoid child support obligations. *Id*. at 327-28, 330. The evidence supported that he received disbursements only for the purpose of paying his share of the corporation's taxes, and this amount was consequently not available to pay child support. *Id*. at 328. The court therefore found no abuse of discretion in the lower court's determination that retained earnings and distributions from

---

[2]Although cases from foreign jurisdictions are not binding on this court, "comparable court decisions of other jurisdictions 'are persuasive authority and entitled to respect.' " *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 395 (2005) (quoting *In re Marriage of Raski*, 64 Ill. App. 3d 629, 633 (1978)). See *Andrews v. Gonzalez*, 2014 IL App (1st) 140342, ¶ 23.

the subchapter S corporation should not be included in the father's income for purposes of calculating child support. *Id*. at 330.

¶ 58    In a similar case from the Supreme Court of Tennessee, *Taylor v. Fezell*, 158 S.W.3d 352, 355 (Tenn. 2005), the supporting parent was the sole shareholder and president of a subchapter S corporation, which he converted to a C corporation after the divorce, thereby eliminating pass-through taxation of the corporation's income. The trial court calculated the father's modified child support obligation by imputing to him the retained earnings from the company as a subchapter S corporation before the divorce, in addition to the wages he earned after conversion of the corporation to a C corporation. *Id*. at 356. Similar to Illinois, the Tennessee child support guidelines defined "gross income" as "all income from any source." (Internal quotation marks omitted.) *Id*. at 357. For the self-employed, the child support guidelines allowed a deduction for reasonable expenses required to produce the income. *Id*. at 358. As a matter of first impression, the court held:

> "[F]or the retained earnings of a corporation to be imputed to the sole or majority shareholder of a corporation, there must be a showing that those retained earnings are excessive or that the income is actually being manipulated. This approach requires trial courts to recognize the independent entity status of a corporation that is properly run by its shareholders. This recognition will require child support determinations to be based on the obligor's actual income and benefits while protecting the corporate entity's existence and the development of capitalization necessary to meet its legitimate business purposes." *Id*.

¶ 59    In determining whether retained earnings are excessive, the *Taylor* supreme court advised that trial courts should examine the level of retained earnings from before the divorce as a benchmark or baseline for future retained earnings or capitalization. *Id.* As an additional component of this analysis, "[e]xpert testimony may be relevant to prove the level of retained earnings that are appropriate for the corporation to carry on its intended purpose, and the court should consider post-divorce corporation activities, particularly any unexplained increases or reductions of capitalization or retained earnings." *Id*. Further, the trial court should also "closely examine personal expenses and economic benefits provided to the obligor by the corporation and should include the value of those extraordinary benefits in the obligor's income calculation." *Id*. at 359. As there was no evidence in *Taylor* that the father manipulated his income or that the retained earnings were excessive, the court held that it was error to include them in calculating his child support obligation, although the trial court should have included the economic value of the private use of his company car. *Id*.

¶ 60    In *In re Marriage of Roth*, 406 N.W.2d 77, 79 (Minn. Ct. App. 1987), the appellate court in Minnesota held, without much explanation, that the trial court should have included profits from the father's closely held subchapter S corporation, of which the father was the sole officer and shareholder, in calculating the father's support obligation. The evidence showed that the father charged significant personal expenses to the corporation and utilized corporate assets for personal use. *Id*.

¶ 61    In *In re Marriage of Merrill*, 587 N.E.2d 188, 191 (Ind. Ct. App. 1992), the appellate court in Indiana held that the trial court did not err in including one-half of the retained earnings from the father's closely held corporation in calculating his income for child support purposes. The Indiana support guidelines provided that income from any source and income from operating a business should be included. *Id*. Although the retained earnings were reinvested in the business

to cover inventory and bills and there was testimony regarding the declining viability of the business, the court, with little analysis, held that the retained earnings should nonetheless be attributed to the father and included in the child support calculation. *Id.*

In *Roberts v. Wright*, 1994-NMCA-022, ¶ 9, 117 N.M. 294, 871 P.2d 390, the appellate court in New Mexico held that the trial court properly refused to consider the mother's corporate earnings in calculating her support obligation. The mother reinvested one year's sizeable corporate earnings in her closely held corporation, which were significantly more than previous years, because a government contract required her to purchase substantial inventory, the contract was essential to the corporation's success, and the market was highly competitive with declining profits. *Id.* ¶ 4. The court held that the evidence established that the reinvestment of retained earnings and the purchase of inventory were necessary to retain the important government contract and continue to be profitable. *Id.* ¶ 9.

### D. Mahantech's Retained Earnings

In the present case, the trial court considered whether Arjuna was the sole shareholder of the subchapter S corporation, whether there was evidence that he was manipulating income to reduce his support obligation, whether the corporation's retained earnings were excessive, and whether there was a legitimate business purpose for not distributing the retained earnings. Based on our review of the above cases from Illinois and from other jurisdictions, we find no error of law in the trial court's approach. *In re Marriage of Eberhardt*, 387 Ill. App. 3d at 231. We find that the well-reasoned decisions of *Brand* and *Taylor* best exemplify the correct approach, that is, courts should engage in a case-by-case, fact-specific analysis to determine whether retained earnings of a corporation should be imputed to the sole or majority shareholder for purposes of calculating child support. *In re Marriage of Brand*, 44 P.3d at 328, 330; *Taylor*, 158 S.W.3d at 358. Relevant factors in this analysis include: (1) the extent of the obligor's ownership share in the corporation, (2) the obligor's ability to decide whether corporate earnings should be retained or distributed, (3) the corporation's history of retained earnings and distributions, in comparison to postdivorce corporation activities, (4) whether the retained earnings are excessive, and (5) whether there is evidence that income is actually being manipulated. *In re Marriage of Brand*, 44 P.3d at 330; *Taylor*, 158 S.W.3d at 358. As noted in *Brand*, heightened scrutiny is appropriate when the obligor has the power to control distributions, but this, in itself, is not dispositive of whether a subchapter S corporation's retained earnings must be included in an obligor's income when calculating child support. *In re Marriage of Brand*, 44 P.3d at 330. As both the *Brand* and *Taylor* courts aptly observed, it is sometimes necessary for a corporation to retain profits in order to secure its continued existence and appropriate capitalization to meet ongoing business necessities. *In re Marriage of Brand*, 44 P.3d at 330; *Taylor*, 158 S.W.3d at 358. Indeed, it would be unfair to the obligor to include in the calculations of income for child support the retained earnings necessary for the continuing viability of a corporation and thus not available to the obligor.

In addition, having reviewed the evidence presented at the hearing on Moorthy's motion, we find no abuse of discretion regarding the trial court's conclusions as to Arjuna's net income and the child support determination. *In re Marriage of Eberhardt*, 387 Ill. App. 3d at 233. The trial court's factual findings were not against the manifest weight of the evidence. *Id.*

We note that there is no prior history of the subchapter S corporation's retained earnings because Arjuna did not acquire Mahantech until after the divorce was finalized. While we

recognize that heightened scrutiny may be warranted where an individual has the ability to control distributions (*In re Marriage of Brand*, 44 P.3d at 330), there was no evidence presented that Arjuna was actually manipulating his income or refusing to declare distributions of Mahantech's income in order to avoid an increase in his child support obligation. Rather, the evidence indicated that Arjuna obtained majority ownership of the corporation at a time when it was not financially successful and he was able to make it more profitable over the years. He testified that the retained earnings must be reinvested in the company to ensure its continued growth and to cover overhead expenses in the event of a business downturn. He continues to draw the same salary of $50,000 per year. His testimony and tax returns outlined the various expenses, including employee salaries, taxes, several types of necessary business insurance, expenses related to the pursuit of federal government contracts through the section 8(a) certification program, and significant amounts dedicated to the immigration and work visa concerns of its employees. Although Mahantech's earnings decreased significantly in 2011, we note that this reduction had a legitimate explanation. *Taylor*, 158 S.W.3d at 358. Arjuna testified that a few contracts which constituted 60% of Mahantech's business ended and had yet to be replaced, causing a loss of income to the corporation. Further, one employee was without a current project to work on, although Mahantech remained responsible for paying that employee's salary. In addition, Arjuna testified that although he was the majority shareholder, he owed a duty to the minority shareholder and could not declare a distribution without considering the other shareholder.

¶ 67    Significantly, Moorthy failed to offer any evidence or testimony to rebut Arjuna's evidence that the retained earnings were necessary and appropriate business actions and were not excessive. Notably, Moorthy did not present the testimony of an accountant or other expert regarding whether the level of retained earnings was in line with the corporation's needs. As noted in *Taylor*, 158 S.W.3d at 358, expert testimony may be helpful and relevant in establishing "the level of retained earnings that are appropriate for the corporation to carry on its intended purpose, and the court should consider post-divorce corporation activities, particularly any unexplained increases or reductions of capitalization or retained earnings." See, *e.g.*, *In re Marriage of Joynt*, 375 Ill. App. 3d at 818 (accountant testified about the retained earnings and other financial information concerning the obligor's closely held subchapter S corporation). Moorthy did not call an expert witness to present any evidence that Arjuna was manipulating his income or that the retained earnings were excessive, and she did not otherwise provide evidence through the examination of Arjuna or any other witness to rebut his testimony regarding Mahantech's financial situation. Despite Moorthy's argument to the contrary, our case law dictates that "[t]he party seeking relief has the burden of showing a change in circumstances substantial enough to warrant a change in support." *In re Marriage of Eberhardt*, 387 Ill. App. 3d at 231.

¶ 68    Although Arjuna's individual tax returns showed that he paid taxes on the portion of Mahantech's earnings that were attributable to him through the schedule K-1, his testimony indicated that the money to pay these taxes came from Mahantech's account, it was sent directly to the taxing agency, and the amount was not distributed to Arjuna first. An equivalent situation occurred in *In re Marriage of Brand*, 44 P.3d at 328, where the father received a distribution from the corporation only for purposes of paying his share of the corporation's taxes, and the court held that this amount was not available to pay child support. We similarly conclude that the amounts used to pay Arjuna's proportionate share of the taxes on

- 16 -

Mahantech's earnings did not constitute disbursements to him that should have been included in the child support calculation.

¶ 69    In addition, we do not find that Arjuna took a "disbursement" from Mahantech's retained earnings or otherwise received income for child support calculation purposes when he obtained a cashier's check at the end of every year for the amount in Mahantech's bank account. Arjuna clarified that he did this at the advice of his accountant in order to avoid paying a state tax on the funds in the corporate bank account. He testified that he never deposited the cashier's checks into his individual account, and each year he redeposited the cashier's checks into Mahantech's account on the first business day in the new year. Accordingly, the only evidence before the trial court was the testimony of Arjuna that he did not actually "receive" the income. As a result, we cannot find that the K-1 income can be used for purposes of calculating his child support obligation. See *In re Marriage of Rogers*, 213 Ill. 2d at 136-37 (noting that the dictionary definition of "income" includes money that is received by the individual).[3]

¶ 70    Moorthy contends that the trial court improperly curtailed her inquiry into Arjuna's testimony about the immigration expenses Mahantech was required to cover in the event that it terminated an employee. According to the report of proceedings, her attorney was questioning Arjuna regarding his testimony that if he laid off any of his foreign workers, Mahantech would be responsible for paying that employee's and his family's expenses to return to their home country. When counsel asked whether it was actually true that Mahantech was required to pay for relocation, Arjuna responded, "It is true. They can file a case against me with immigration to put me–make my life miserable." Counsel then stated, "If I were to show you the immigration regulations–," but Arjuna's attorney objected based on relevance. The trial court sustained the objection and voiced concern that "we're getting into issues of law that you're trying to inquire about. He just testified as to what his understanding is, and you're certainly free to call other witnesses if you want to rebut that testimony, but his testimony is to what he understands to be his expense. That stands as that. I'll hear from other witness–." We find no error in the trial court's ruling as Arjuna was testifying to the facts of his case according to his own understanding, he is not a lawyer, and he was not presenting expert legal testimony regarding immigration regulations. The trial court did not improperly curtail Moorthy's inquiry; rather, it specifically stated that it was willing to hear testimony from other witnesses to rebut Arjuna's testimony. Whether to follow up by presenting other witnesses or evidence,

---

[3]We recognize that this procedure utilized on the advice of Arjuna's accountant, the paying out of the balance of the available funds at the end of every year and redeposit of those funds, raises several questions. First, from an accounting standpoint, it may be argued that since a check was issued and then redeposited, this could be considered a distribution and then a loan back to the corporation. However, while the record reflects that this was done on the advice of Arjuna's accountant in order to avoid West Virginia taxation, the record is devoid of any evidence as to how this transaction was characterized on the corporate books and records. Further, it is unclear from the testimony in the record as to whether 100% of the funds available at the end of the calendar year were distributed to Arjuna or whether 91% was distributed to him and 9% to the other shareholder and then redeposited. However, we do not find that these questions impact our decision herein. As noted above, the trial court did not err in characterizing the funds left in the corporation as retained earnings and that this procedure utilized to avoid West Virginia taxes did not result in the receipt of "income" for the purposes of child support calculations. See *In re Marriage of Rogers*, 213 Ill. 2d at 136-37.

as the trial court suggested, was a decision for Moorthy's counsel. Further, it is noteworthy that Arjuna was extensively cross-examined regarding Mahantech's business expenditures. In any event, even if it was an abuse of discretion to curtail the cross-examination in this way, it was on a small point and was therefore harmless. Lastly, in the absence of an offer of proof as to the excluded testimony, we must consider this issue to be waived.

¶ 71    Having determined that the trial court did not abuse its discretion in determining Arjuna's child support obligation, we need not address Moorthy's related contention that the court should resort to income averaging to calculate his obligation. See *In re Marriage of Nelson*, 297 Ill. App. 3d 651, 655 (1998) (where the obligor's income fluctuates, it is appropriate, although not mandatory, for the court to average the obligor's net income over consecutive years). The evidence showed that Arjuna's income has been the same since 2007 through the time the petition was filed, that is, a salary of $50,000 per year. The trial court therefore determined that his monthly support obligation was $643, based on that constant figure.

¶ 72                                     E. Child Care Costs

¶ 73    Moorthy also contends on appeal that the trial court erred in denying her request for contribution to expenses for daycare and educational and extracurricular activities. Arjuna argues that in Moorthy's petition in the trial court, she asked only for a contribution to daycare expenses, but not any extracurricular expenses. A party forfeits an issue on appeal where she fails to raise it before the trial court. *In re Aaliyah L.H.*, 2013 IL App (2d) 120414, ¶ 21 (citing *Einstein v. Nijim*, 358 Ill. App. 3d 263, 275 (2005)). However, although Moorthy's petition filed in the trial court made a generic request for contribution to daycare expenses, without specifically mentioning extracurricular activities, Moorthy testified extensively regarding the various extracurricular and educational expenses and the trial court's ruling considered these other costs.

¶ 74    A trial court's determination whether to order the supporting parent to contribute toward daycare costs, in addition to paying the statutorily mandated child support amount, is reviewed for an abuse of discretion on appeal. *In re Aaliyah L.H.*, 2013 IL App (2d) 120414, ¶ 19 (citing *In re Marriage of Serna*, 172 Ill. App. 3d 1051, 1054 (1988)). The statute authorizes a trial court to order the supporting parent to pay an amount in excess of the guidelines. *In re Marriage of Serna*, 172 Ill. App. 3d at 1054 (citing Ill. Rev. Stat. 1987, ch. 40, ¶ 505(a) (now 750 ILCS 5/505 (West 2012)). "The *Serna* court held, in addition to the statutory child support amount under section 505 ***, the trial court has discretion to also order the noncustodial parent to pay half of the daycare expenses and other reasonable expenses." *In re Marriage of Carlson-Urbanczyk*, 2013 IL App (3d) 120731, ¶ 15 (citing *In re Marriage of Serna*, 172 Ill. App. 3d at 1054). In *In re Marriage of Carlson-Urbanczyk*, the court held that any amount above the statutorily provided amount "represents an upward deviation from the statutory amount that must be supported by the record." *Id.* (citing *In re Marriage of Demattia*, 302 Ill. App. 3d at 394).

¶ 75    We note that Moorthy provides no citation to any controlling statutory authority or case law to support her contentions on appeal. " 'A court of review is entitled to have the issues clearly defined and to be cited pertinent authority.' " *Lake County Grading Co. v. Village of Antioch*, 2014 IL 115805, ¶ 36 (quoting *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56). A party fails to fulfill the requirements of Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) if she does not present argument along with

citations to relevant supporting authority. *Lake County*, 2014 IL 115805, ¶ 36. As a result, we find that Moorthy has forfeited these contentions on appeal. *Id.*

¶ 76 Even if we were to address the issue of daycare expenses despite Moorthy's having forfeited it, we would nevertheless conclude that, based on the evidence presented at the hearing, there was no abuse of discretion. The trial court held that Moorthy "shall continue to be solely responsible for the daycare arrangements" of the minor and that "Moorthy's Petition as it relates to the daycare expenses is denied." The order goes on to note that "Moorthy is in a far superior position to support the daycare arrangements, as she deems necessary based upon her work schedule and the activity schedule that she has selected by [*sic*] Seema without consultation with Arjuna." The trial court's decision not to depart from the guidelines and order Arjuna to pay any additional amounts toward daycare was reasonable when considering both his limited income and Moorthy's income from her company, and it was not an abuse of discretion.

¶ 77                                III. CONCLUSION

¶ 78 Based on the above analysis, we conclude that the trial court did not abuse its discretion when it excluded from its child support calculations Arjuna's proportionate share of the retained earnings from Mahantech. The trial court also did not abuse its discretion in denying Moorthy's request for an additional amount for daycare expenses.

¶ 79 Affirmed.