NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250184-U

NOS. 4-25-0184, 4-25-0811 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 22, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF MARIE A. WHITE, | ) | Appeal from the |
| Petitioner-Appellant, | ) | Circuit Court of |
| and | ) | Tazewell County |
| ADAM G. WHITE, | ) | No. 20D9 |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Lisa Y. Wilson, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed the judgments in this consolidated appeal.
Concerning appeal No. 4-25-0184, the court found (1) Running Central, which
was never converted into marital property, was properly awarded to respondent as
his nonmarital property; (2) 414 Holdings, which was marital property, was
properly awarded to respondent; (3) ShaZam Racing's equitable value was $0
when the bifurcated judgment dissolving the marriage was entered, which was the
correct time to value property, even though it increased in value after the marriage
was dissolved; and (4) neither Running Central's retained earnings nor
distributions were income for purposes of calculating child support and
maintenance. Regarding appeal No. 4-25-0811, the court found (1) it lacked
jurisdiction over the appeal because petitioner purged the contempt and
(2) awarding respondent attorney fees for having to bring the contempt petition
was proper because the Illinois Marriage and Dissolution of Marriage Act (750
ILCS 5/101 *et seq.* (West 2024)) allows for attorney fees in such situations.

¶ 2          This consolidated appeal involves two cases: a dissolution of marriage (appeal

No. 4-25-0184) and an indirect civil contempt finding (appeal No. 4-25-0881). In the dissolution

of marriage case, petitioner, Marie A. White, petitioned to dissolve her marriage to respondent,

Adam G. White, after 11 years of marriage. The focus of the extensive dissolution proceedings that followed included child support for the parties' daughter; maintenance for petitioner; whether various properties, including Running Central (a retail business) and 414 Holdings (the operating company for Running Central) were marital or nonmarital property, and if marital, to whom the property should be awarded; the value of other businesses; and whether Running Central's retained earnings and distributions to respondent constituted income for purposes of calculating child support and maintenance.

¶ 3        In the contempt action, after the marriage was dissolved and property divided between the parties, respondent filed a petition for rule to show cause why petitioner should not be held in contempt for refusing to complete a personal financial statement respondent needed to refinance property awarded to him and remove petitioner's name from loan documents. The trial court held petitioner in indirect civil contempt and awarded respondent attorney fees. Petitioner then moved the court to enter a sanction so she could appeal the contempt finding. A few days later, petitioner purged the contempt by completing a personal financial statement. Two months later, the court entered an amended order, adding a sanction of $100 per day until petitioner purged the contempt to the indirect civil contempt order. The court observed no fine would be imposed because petitioner had already purged the contempt. Petitioner filed her notice of appeal within 30 days thereafter.

¶ 4        The dispositive issues raised on appeal concern whether (1) Running Central was marital or nonmarital property; (2) marital property, including 414 Holdings, was equitably distributed; (3) ShaZam Racing, another business, had an equitable value of more than $0; (4) Running Central's retained earnings and distributions it made to respondent were income for purposes of calculating child support and maintenance; (5) we have jurisdiction over the appeal

of the contempt finding; and (6) the attorney fees awarded to respondent for bringing the contempt petition were proper even though petitioner purged the contempt. For the reasons that follow, we affirm.

¶ 5                    I. BACKGROUND

¶ 6        The proceedings before the trial court were lengthy and disjointed, partly because many witnesses were called during other witnesses' testimony; documents in both cases were intermixed; and petitioner's attorney, who sought over $227,000 in fees, continually repeated questions already asked. To give a better and more concise understanding of the facts supporting the issues raised, we have combined (1) testimony presented during several hearings and (2) judgments addressing the same subjects. We have also presented some evidence out of order to better understand exactly what transpired.

¶ 7            A. The Dissolution of Marriage Case (Appeal No. 4-25-0184)

¶ 8        In January 2020, petitioner petitioned to dissolve the marriage. She later sought child support and maintenance. In December 2022, the trial court entered a temporary order, awarding petitioner monthly child support of $2,009 and monthly maintenance of $3,600.17. Maintenance was to be paid for four years and eight months. The court arrived at these amounts after finding Running Central's retained earnings and distributions it made to respondent, its sole shareholder, constituted income. Because no support had been paid since the commencement of the divorce proceedings, petitioner filed a motion for entry of judgment for arrearages in support. The total arrearage for both was $75,506.64, which respondent was ordered to pay petitioner in monthly installments of $1,121.83. Thereafter, the court entered a bifurcated judgment, dividing some property between the parties and dissolving the marriage.

¶ 9        Evidence presented at the proceedings revealed that long before petitioner and

respondent were married, respondent's parents set up the White family trust for their children. Respondent's parents subsequently died in a plane crash in 2001. Within a year, respondent and his siblings filed a wrongful death suit. Six years later, respondent and his brother, Ian, purchased Running Central, a retail S corporation specializing in running shoes and clothing. Respondent also had a 75% interest in both ShaZam Racing and Whiskey Daddle, two companies involved in event management, timing, and scoring used in races. ShaZam Racing was still viable and earned income with the help of the COVID-19 Paycheck Protection Program (PPP) after earning nothing or very little for several years. Whiskey Daddle, although earning $11,885 in 2021, went out of business the same year. (The record does not indicate whether the money Whiskey Daddle earned was from the PPP.)

¶ 10        When respondent and Ian purchased Running Central, Cass Schmidt, a certified public accountant (CPA), did the bookkeeping for the business, which included calculating tax returns for quarterly payroll, sales, and annual income. Schmidt, who had started working with the original owners of Running Central in 1977, decided to retire around 2020.

¶ 11        Soon after respondent bought Running Central, petitioner, who worked for a law firm, began working for Running Central after work and on the weekends. In April 2009, respondent and petitioner were married. With a $200,000 loan from petitioner's mother, they purchased a marital home, which petitioner continued to pay the mortgage on and live in after the petition to dissolve the marriage was filed. Petitioner also paid some of the property taxes with distributions she received from 414 Holdings. The amount of taxes paid was not revealed. Respondent's appraiser valued the home at $400,000. Petitioner's appraiser valued it at $375,000, citing comparable homes farther away from the couple's home.

¶ 12        In June 2009, respondent bought Ian out of Running Central, exchanging his 25%

- 4 -

interest in the White family trust for Ian's 50% share of Running Central. Respondent and petitioner's daughter was born 18 months later, in December 2010. Petitioner eventually stopped working regularly around 2012 to take care of the parties' daughter.

¶ 13        In 2013, respondent and petitioner established 414 Holdings, a real estate holding company, each having a 50% interest in this business. Petitioner, who was the office manager for Running Central, took over bookkeeping for 414 Holdings, which purchased a condominium at 311 Southwest Water Street in Peoria, Illinois, in October 2013. 414 Holdings owned the Water Street condominium and leased it to Running Central, which moved and reestablished its retail business there. ShaZam Racing also operated out of the Water Street property and paid rent to 414 Holdings. The couple decided to move and expand Running Central because they hoped Caterpillar executives who lived and worked in the area would shop at the store.

¶ 14        To update the Water Street condominium, make it suitable for Running Central, and expand the business's running shoe and clothing lines, a renovation project was planned. The couple contributed $197,500 toward the project, and 414 Holdings took out loans, including a substantial Small Business Administration (SBA) loan from SomerCor 504, Inc. Monthly payments were made to 414 Holdings on the loans. 414 Holdings paid real estate taxes and insurance premiums with rent collected from Running Central and ShaZam Racing. Petitioner participated in obtaining the loans because her credit, unlike respondent's and Running Central's, was "[v]ery good." Per the SBA's regulations, both petitioner and respondent were designated on the SBA loan as equal shareholders of Running Central and personally guaranteed the loan. Respondent was listed as the president of Running Central on the SBA loan documents, put up Running Central to secure the loan, and certified petitioner owned half of Running Central. Petitioner did not put up any collateral and was designated as the secretary/treasurer of Running

Central. Running Central's stock ownership percentages were never changed to reflect petitioner had any interest, let alone a 50% interest, in the business. Likewise, none of the corporate annual reports indicated petitioner had an interest in the business, no other ownership documents designated her an owner, and respondent never intended to gift any of Running Central to her. Although petitioner conceded she and respondent did not specifically agree to respondent giving her a 50% interest in Running Central, she believed there "was an understanding," a "[v]erbal agreement" to that effect.

¶ 15 In addition to loans, the Water Street property was purchased and improved with some of the over $900,000 respondent received from the settlement of his parents' wrongful death suit. Respondent first deposited the settlement money in the parties' joint checking account, which was an account respondent had before the couple married and to which respondent added petitioner's name. Paychecks were deposited into this checking account, which was also used for payment of both personal and certain business expenses. When respondent put the settlement money in the parties' joint account, he never intended to give petitioner any of it.

¶ 16 The first settlement installment of $450,432 was deposited in the joint account on December 19, 2013, and the second installment of $451,682 was deposited on January 3, 2014. Thereafter, the following funds were deposited in or withdrawn from the account on the specified dates: (1) $65,000 was transferred to Running Central to pay bills (December 19, 2013); (2) $153,000 was transferred to Running Central to pay bills and was designated as a loan to Running Central shareholders (December 20, 2013) (In later years, the total amount of shareholder loans increased from $153,000 to over $300,000.); (3) a $3,054 paycheck of one of the parties was deposited (December 20, 2013); (4) $133,868 was paid for closing costs on the Water Street property (December 20, 2013); (5) $5,000 was paid toward the parties' outstanding

personal credit card balance (December 23, 2013); (6) $6,400 was paid for the interior design of the Water Street property (January 6, 2014); (7) $5,000 was paid toward the parties' outstanding personal credit card balance (January 9, 2014); (8) $1,710 was paid in association fees for the Water Street property (January 16, 2014); (9) $36,594 was used to purchase a vehicle for petitioner, which was eventually traded in for a truck to which Running Central had title (January 22, 2014); (10) $1,710 was paid in association fees for the Water Street property (February 4, 2014); (11) $45,000 was deposited in 414 Holdings' checking account (February 9, 2014); (12) a $3,000 paycheck for one of the parties was deposited (February 9, 2014); (13) a $3,000 paycheck for one of the parties was deposited (February 28, 2014); (14) $1,710 was paid in association fees for the Water Street property (March 1, 2014); (15) $1,613 was paid for 414 Holdings' legal fees (March 1, 2014); (16) $7,069 was paid to the general contractor of the Water Street property project (March 9, 2014); (17) $12,528.87 was paid in architectural and engineering fees for the Water Street property (March 10, 2014); (18) $7,900 in SBA loan fees was paid; and (19) $716.92 was paid in utilities for the Water Street property (June 6, 2014).

¶ 17        This list includes expenses cited in petitioner's brief, which she referred to as "expenditures and loans from [the parties'] joint account to support Running Central," plus other expenses to which she testified. The total of the expenses listed above was $484,819.79, a little more than half of the total settlement respondent received from his parents' wrongful death suit.

¶ 18        The couple, who had lived a life beyond their financial means, continued to do so, to the detriment of Running Central. For example, Running Central paid respondent (1) $197,505 in 2016, (2) $169,846 in 2017, (3) $189,596 in 2018, and (4) $180,192 in 2019. During that same time, Running Central's business income loss was between $56,289 and $78,259, with a positive business income ($328) in only 2017. Similarly, Running Central suffered retained earning

losses of between $273,462 and $438,671.

¶ 19    The parties and Schmidt theorized some of these losses were attributable to Caterpillar moving to Deerfield, Illinois. Schmidt also believed the parties viewed Running Central as less important than having a comfortable lifestyle, which resulted in Running Central owing money to vendors and not having adequate inventory. Petitioner and respondent recognized this, too. Petitioner admitted there was a time Running Central was substantially behind in paying its vendors. Respondent indicated, without vendors, he placed individual orders for shoes for customers, paying the same amount for the products as the customers would by ordering the shoes online themselves. Respondent did this only because he wanted to keep customers. Given that Running Central was losing money, petitioner and respondent spoke with an attorney, who agreed the business was failing, and prepared to file for bankruptcy.

¶ 20    In 2020, respondent locked petitioner out of her Running Central e-mail because she no longer worked for Running Central. Respondent indicated this was done pursuant to the employee handbook petitioner helped create. However, respondent gave petitioner time to retrieve any personal information her e-mail contained. Petitioner allegedly failed to retrieve all the information she wanted. Petitioner asked the trial court to give her access to her e-mail account. The court admonished the parties to resolve this issue on their own.

¶ 21    After she filed the petition to dissolve the marriage, petitioner used her credit card to pay for her and their daughter's living expenses. Petitioner had no receipts reflecting what expenses were paid. Respondent produced receipts showing petitioner withdrew a total of $72,478.74 from 414 Holdings in 2020 and after. Petitioner indicated she withdrew some funds from the account when respondent closed 414 Holdings' account and opened another account to which she had no access.

¶ 22	The COVID-19 pandemic hit, and respondent was able to secure several COVID-19 created loans to cover expenses and pay outstanding vendor bills of Running Central. Petitioner, who went back to school and earned her nursing license, began working in the local hospital's pediatric subspecialty neurology clinic in August 2021, earning approximately $58,000 per year. Respondent earned around $52,000 per year. The gross income on his tax return was almost six times this amount because it included distributions Running Central made to him. These distributions were used to satisfy the estimated quarterly pass-through taxes respondent, as the sole shareholder of Running Central, was assessed.

¶ 23	Schmidt and Neil Gerber, another CPA, explained income tax for Running Central, an S corporation, flowed through to respondent, who reported Running Central's taxable income on his personal income tax return. Respondent would then pay his estimated quarterly taxes with the distributions he received from Running Central. Schmidt clarified the distributions respondent received to pay taxes were not available to respondent for his personal use. Respondent confirmed this with exhibits indicating that from 2020 to 2023, the distributions he received went to pay the amount of taxes he owed "to the penny." However, respondent admitted there were a few times he purchased things, like a piano for the parties' daughter, with distribution money.

¶ 24	After 2021, Running Central's business continued to do much better. Respondent increased his salary to $55,500 in 2022 and $85,000 in 2023—excluding money used to pay for ancillaries, like his life insurance, a cell phone, and transportation—and he received distributions of $131,000 up to July 2022 to pay pass-through taxes. Running Central's net income as of July 2022 was $238,775.32, and its gross sales were $2,339,517, the highest the business had ever had. Petitioner attributed the increase in sales to Running Central carrying Lululemon, noting,

since offering this line, "sales just have not come down." She also theorized the COVID-19 relief respondent received contributed to Running Central's success by enabling respondent to pay vendors and buy inventory.

¶ 25    Although Running Central was doing well financially, Schmidt believed respondent's salary of $85,000 in 2023 was too high. Schmidt, who admitted he was fiscally conservative, stated having money in the bank was key to running a retail business because vendors needed to be paid and inventory replenished and paying oneself a large salary out of the business's profits "foolish[ly]" reduced that source of funds. Schmidt confirmed he had this view even though Running Central's gross sales of $5 million in 2022 and profits were "a lot higher" than he had ever seen. He was careful to note that profit for a retail business was not the same as income for the owner.

¶ 26    Schmidt was asked how to assess respondent's income for purposes of awarding child support and maintenance. Although he was "[t]otally unfamiliar with that area," he suggested one look at the net profits of 414 Holdings and Running Central, balance that against fixed expenses, and consider what would be good cash management. Schmidt elaborated one should (1) look at the businesses' tax returns, which would indicate what the profits were; (2) assess the businesses' cash needs; and then (3) take what was left over, after accounting for these two things, as cash available for the parties' family. Schmidt warned one needed to be aware that 414 Holdings had lots of debt, i.e., loans to repay, and Running Central had monthly fixed expenses, e.g., rent and insurance. He opined Running Central's profit, which should be considered, was somewhat meaningless, explaining what was more important was considering what was left over after paying all the taxes and inventory obligations, employees' salaries, rent, utilities, and bills associated with maintaining and improving the Water Street property and

- 10 -

expanding Running Central's product lines. "[O]nly after all of those obligations were determined and met" should one look at what the parties had left for themselves and their daughter. Schmidt stressed again the need for Running Central to have adequate money in the bank, noting that if it got behind on paying vendors and could not obtain new product, like had happened in the past, this would be "the beginning of the tightening of the noose," which was "not a good thing."

¶ 27 In 2021, respondent's girlfriend, Heather Doty, began working for Running Central, earning $37,500 per year. In May 2022, respondent loaned her $10,000 to buy a car, which she paid back. He also loaned another employee $3,500 to buy a car, which the employee was in the process of repaying. Respondent and Doty bought a home for over $400,000. Respondent used around $20,000 in marital assets to pay for various fees associated with buying the new house.

¶ 28 Around December 2022, Gerber, who was hired to assess the value of the businesses, discovered four mistakes in respondent's tax returns from 2016 to 2022. The biggest mistake Gerber found, which he relayed to Schmidt, concerned reporting as income on the 2022 tax return $400,000 in vendor discounts. These discounts were given to retail businesses to sell inventory at a greater profit margin if they purchased a certain quantity of product or paid on time. The mistakes resulted in Running Central's income being understated.

¶ 29 Jeni Couri, who prepared respondent's 2022 tax return, admitted she, among other errors, mistakenly reported as income vendor discounts, which she believed were customer discounts. She did not intentionally misreport this, nor did respondent ask her to do it. Couri assured the trial court an amended tax return would be filed, the net effect of which would show an increase in profits in 2021 and 2022 of over $377,000. Schmidt explained this would also

result in respondent paying about $135,000 more in federal and state income taxes, penalties, and interest. Couri, like Schmidt, confirmed this net increase in profit did not result in respondent's income increasing, and Schmidt asserted this "[d]efinitely [did] not mean that there is additional cash in the checking account." Schmidt continued, "[I]n fact, there will be less cash because [respondent] is going to have to pay [for the mistake]."

¶ 30 Using the amended returns and other documents, Gerber determined, as of December 31, 2022, Running Central had an equity value of $1 million. He reached this figure by taking the value of Running Central's assets ($1.473 million) and subtracting its debt ($473,000). Gerber testified assessing 414 Holdings' value was different. Whereas Running Central, as an operating company, had employees, customers, name recognition, and intangibles, 414 Holdings was simply an operating company that obtained a mortgage for and owned the condominium on Water Street out of which Running Central and ShaZam Racing operated. Gerber determined the net equity value of 414 Holdings as of December 31, 2022, was $375,000. Gerber reached this figure by taking the value of the Water Street real estate ($1.575 million), the cash on hand ($62,952), the amount of a cashier's check petitioner obtained from 414 Holdings' bank account ($34,979) and subtracting all of 414 Holdings' debt ($1,297,931). Gerber also concluded both Whiskey Daddle, which went out of business, and ShaZam Racing had an equity value of $0.

¶ 31 In November 2024, the trial court resolved all outstanding issues, and it later amended that judgment in January 2025 based on petitioner's objections to, among other things, respondent's income in certain years. Reading these two orders together, "[t]he court having considered all the evidence," found, in relevant part, respondent's annual income from 2021 to 2023 was, respectively, $52,030, $55,000, and $115,044. Petitioner's yearly income during the

same time was, respectively, $62,376, $58,584, and $60,948. The court then ordered respondent to pay petitioner maintenance of $424 per month for four years and eight months, beginning in 2023, for a total of $23,744. Because respondent had paid more than this total under the temporary maintenance order, the court found respondent's support obligation was paid in full, entitling him to a credit of $51,859.57. Regarding child support, the court ordered respondent to pay monthly child support of $52 until the parties' daughter turned 18 years old or graduated from high school, whichever was latest. Because respondent was paying more than this under the temporary order, the court found he was entitled to a child support credit of $36,189. The court also found respondent was entitled to a credit of $22,436.60 for his overpayment of the arrearage of temporary maintenance and child support. The court then awarded respondent (1) Running Central, his nonmarital asset, which was valued at $1 million; (2) ShaZam Racing and Whiskey Daddle, which both had an equity value of $0; and (3) 414 Holdings, marital property valued at $375,000. The court then ordered petitioner to pay respondent a credit regarding 414 Holdings. This represented the value of 414 Holdings ($375,000) less respondent's nonmarital contributions ($300,951.18), for a total of $74,048.82. The court determined petitioner was entitled to half this amount ($37,024.21), which was offset by the $72,278.74 petitioner improperly withdrew from 414 Holdings' bank account, for a total credit of $24,496.23 due respondent.

¶ 32        The trial court then awarded petitioner the marital home, which it valued at $400,000. It ordered the $200,000 petitioner's mother loaned the parties to buy the home and the mortgage of $87,628 on the house to be deducted from that amount, leaving an equity value in the house of $112,372. The court ordered petitioner to pay respondent half the equity value, or $56,186. The court found petitioner was entitled to a credit of $10,000, which was half of the

marital funds respondent used to buy a new home with Doty. The court then divided the credit card debts and fees related to Gerber, the guardian *ad litem*, and the attorneys. Once all credits and debts were assessed, the court found petitioner owed respondent $162,198.90, or, subtracting her interest in the marital home, $106,012.90. The court ordered "[b]oth parties [to] refinance loans associated with the assets awarded to that party and cause the other party's name to be removed as a liable party or guarantor, including but not limited to *** the SBA loan." The court then specially ordered "Respondent *** to refinance all loans *** including the SAB [*sic*] loan *** within 120 days from the entry of this Amended Judgment and cause Petitioner's name to be removed as a liable party or guarantor."

¶ 33 Respondent timely moved the trial court to reconsider the amended judgment. He asked the court to give him credit for his equity in the marital home and the amount he owed Gerber and petitioner's attorney instead of ordering petitioner to pay him the outstanding amounts. The court denied the motion, and petitioner appealed four days later.

¶ 34  B. The Indirect Civil Contempt Finding (Appeal No. 4-25-0811)

¶ 35 Both parties subsequently filed numerous petitions for rules to show cause. As the trial court recognized, many of the petitions essentially sought to relitigate the dissolution of marriage by, among other things, presenting new evidence concerning the equity value of various properties, including ShaZam Racing.

¶ 36 In February 2025, while his motion to reconsider the amended judgment dissolving the marriage was pending, respondent petitioned the trial court to hold petitioner in contempt because she did not complete a personal financial statement he needed to refinance the SBA loan and remove petitioner's name from the loan documents.

¶ 37 On May 2, 2025, the trial court held petitioner in indirect civil contempt for

- 14 -

failing to complete the statement and told her she could purge the contempt by completing the statement and submitting it to respondent's attorney and SomerCor 504, Inc., the bank from which the SBA loan was taken. The court also directed respondent's attorney, who had asked for attorney fees in bringing the petition, to file an affidavit for attorney fees.

¶ 38 On May 5, 2025, petitioner moved the trial court to enter an amended indirect civil contempt order, adding a sanction requiring her to pay $100 per day until she purged the contempt. She argued, without this sanction, she could not appeal the May 2, 2025, order finding her in indirect civil contempt.

¶ 39 On May 12, 2025, respondent's attorney filed an affidavit for attorney fees. Three days later, on May 15, 2025, the trial court ordered petitioner to pay respondent $4,000 in attorney fees. The next day, May 16, 2025, petitioner purged the contempt by submitting an unredacted personal financial statement.

¶ 40 On July 10, 2025, following proceedings on another petition for rule to show cause, the trial court and the parties addressed petitioner's May 5, 2025, motion to amend the indirect civil contempt order. The following discussion on that issue proceeded as follows:

"THE COURT: Well, I basically found that she had purged the contempt—

MR. WAKEMAN [(PETITIONER'S ATTORNEY)]: That's true.

THE COURT:—by—

MS. SERRITELLA [(RESPONDENT'S ATTORNEY)]: The financial statement.

THE COURT:—by doing the financial statement.

MR WAKEMAN: You did. That's all true, [Y]our Honor.

THE COURT: So—

MS. SERRITELLA: I just don't think that this is needed.

MR. WAKEMAN: But the language—the reason that this wasn't a final and appealable order is because it did not have an appropriate sanction and that is—what we're seeking to do is to remedy that to make that final and appealable order by the addition of paragraph five which says, '[Petitioner's] failure to purge the contempt on or before May 7th will subject her to a fine of $100 per day thereafter until the contempt is purged.' Contempt findings are payable [*sic*] if there is a fine—

THE COURT: So if I enter it, I mean, she wouldn't be fined because the Court's found that she's purged her contempt.

MR. WAKEMAN: That's true.

MS. SERRITELLA: And you ordered attorney's fees as a sanction—

THE COURT: Yeah.

MS. SERRITELLA:—which are due Monday.

MR. WAKEMAN: But that renders the order final and appealable.

THE COURT: I have no problem with signing that—

MS. SERRITELLA: That's fine."

¶ 41   An amended order, adding the $100 per day sanction, was entered that same day. Petitioner filed her notice of appeal on August 5, 2025, 26 days later.

¶ 42   On our own order, the appeals were consolidated.

¶ 43   In a motion taken with this case, petitioner asks this court to take judicial notice of exhibit 1, petitioner's response to petition for rule to show cause/indirect civil contempt filed in

- 16 -

the trial court on April 14, 2025. There being no objection, this court grants the motion.

¶ 44                                    II. ANALYSIS

¶ 45            The dispositive issues raised on appeal are whether (1) Running Central was marital or nonmarital property; (2) 414 Holdings, which was found to be marital, was properly awarded to respondent in light of the total distribution of property; (3) ShaZam Racing's equity value was in fact $0; (4) Running Central's retained earnings and distributions it made to respondent were not income for purposes of calculating child support and maintenance; (5) we have jurisdiction over the appeal of the contempt finding; and (6) the award of attorney fees was proper even though petitioner purged the contempt.

¶ 46            However, before considering these issues, we address several preliminary claims raised by petitioner.

¶ 47                              A. Preliminary Matters

¶ 48                     1. *Preliminary Evidentiary Claims Regarding Income*

¶ 49            Petitioner argues the trial court (1) "invented [respondent's] income figures," (2) ignored respondent's earnings from 414 Holdings, and (3) failed to consider other sources of respondent's income.

¶ 50            We initially note respondent has not specifically responded to the first two claims regarding his income. "When an appellee does not address arguments in [the] brief, [the appellee's] position should be equivalent to that as if [the appellee] had not filed a brief at all." *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1088 (1995). The supreme court has set forth three distinct discretionary options a reviewing court may exercise in the absence of an appellee's brief. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). We may (1) serve as an advocate for the appellee and decide the case if we determine justice so

requires, (2) decide the merits of the case when the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) reverse the trial court when the appellant's brief demonstrates *prima fac*ie reversible error that the record supports. *Id.*

¶ 51 Here, we will not serve as an advocate for respondent, and the record is far from simple. Accordingly, we will reverse the trial court on these findings only if petitioner's brief establishes *prima facie* reversible error. " '*Prima facie*' means, '[a]t first sight; on first appearance but subject to further evidence or information' and '[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted.' " *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (quoting Black's Law Dictionary 1228 (8th ed. 2004)). On review, we consider whether the court's child support or maintenance order was "an abuse of discretion or the factual predicate for the decision is against the manifest weight of the evidence." *Slagel v. Wessels*, 314 Ill. App. 3d 330, 332 (2000); *In re Marriage of Gabriel*, 2020 Il App (1st) 182710, ¶ 39 (holding the appellate court defers to the factual findings as to the parties' income so long as they are not against the manifest weight of the evidence).

¶ 52 First, petitioner suggests the trial court, without any basis in the record, set respondent's 2020 and 2021 incomes at $52,030, his 2022 income at $55,000, and his 2023 income at $115,044. Although it is true the court, when orally ruling, found respondent's gross income in 2020 was $52,030, the court's written judgment does not refer to respondent's 2020 income, and nothing suggests it was used in any way in awarding child support or maintenance, dividing property, charging fees, or distributing debt. Thus, even if that finding was made in error, an error the record does not support, it is harmless. See *In re Marriage of Stockton*, 169 Ill. App. 3d 318, 324-25 (1988) (finding although the trial court's calculation of the father's income was erroneous, the error was harmless because the court relied on other evidence to set child

support below the statutory guidelines). That said, the record supports the 2021, 2022, and 2023 amounts. With regard to respondent's 2021 income, petitioner's exhibit No. 3A and several tax forms included in the record list respondent's 2021 income as $52,030. Concerning respondent's 2022 income, in her objection to the proposed judgment for dissolution of marriage, petitioner argued respondent's 2022 income should be changed to $55,000 because that is what "the Court found that income to be." Petitioner cannot complain now about an alleged error she invited. See *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44 (noting invited error, which goes beyond mere forfeiture, prohibits a party from raising alleged errors on appeal the party actively invited). Invited error aside, respondent and Schmidt testified numerous times respondent's income was $55,000 in 2022. Regarding respondent's 2023 income, records respondent submitted and testimony from respondent and Schmidt showed respondent's 2023 salary was $85,000, *excluding* ancillary benefits, such as a cell phone, life insurance policy, and company car. "[P]lus the extras that [Running Central] pays [him]," respondent specifically testified his "[t]otal compensation is around $115,000." The $44 discrepancy between what respondent testified to and the court found is, in our opinion, a distinction without any real difference, especially when the court's ruling favored petitioner.

¶ 53        Next, petitioner claims when the trial court awarded respondent 414 Holdings, it failed to give her credit for what respondent earned from 2020 to 2022. She notes respondent reported income of $7,584 in 2020, $36,028 in 2021, and $43,505 in 2022. Although petitioner is correct respondent earned this amount, she ignores the fact she, too, earned the same amount from 414 Holdings during the same time. Specifically, on her returns, under "additional income" from a "partnership," "S corporation," or similar entity, she lists income of $7,584 in 2020, $36,028 in 2021, and $43,505 in 2022. These are the exact same amounts respondent earned

during the same years. Thus, in our view, the court did not ignore these amounts but found them a nonissue in equitably dividing the property because one party was not receiving more than the other during the relevant time.

¶ 54 Petitioner next asks this court to assume respondent will make the same amount from 414 Holdings in the future and argues that, under section 504(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(a)(1) (West 2024)), the court should have considered how much income respondent will make from 414 Holdings in the future before setting a maintenance award. Nothing in the section to which petitioner cites provides for that. See *id.* (noting that a court may award maintenance after considering "the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage"). The case on which petitioner relies, *In re Marriage of Price*, 2013 IL App (4th) 120155, ¶ 24, to argue the court should have considered respondent's potential income is not persuasive here, as the first case to initially provide for this, *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 161 (1993), stated, "[T]he trial court, when determining the amount of the maintenance, should consider *on remand both* (1) the parties' incomes at the time of the dissolution of their marriage, and (2) their potential incomes, *as well as that can be determined*." (Emphases added.) This case is not being remanded for a maintenance determination and, given the volatile nature of the brick-and-mortar retail business, this court concludes respondent's potential income cannot necessarily be determined.

¶ 55 We conclude, therefore, petitioner has failed to demonstrate *prima facie* reversible error supported by the record with respect to these two claims regarding the trial court's calculation of respondent's income.

¶ 56         Finally, citing sections 504(b-3) and 505(a)(3)(A) of the Act (750 ILCS 5/504(b-3), 505(a)(3)(A) (West 2024)), petitioner argues the trial court was required to consider all of respondent's income from every source in determining child support and maintenance, and here, the court did not consider respondent earned (1) $11,885 from Whiskey Daddle in 2021 and (2) almost $100,000 from ShaZam Racing in 2020 to 2022. Although the court did not articulate it considered income from these two sources in entering the judgment dissolving the marriage, nothing requires the court to verbalize all the evidence it considered or indicates here the court ignored that income. See *In re Marriage of Miller*, 231 Ill. App. 3d 480, 485 (1992) (suggesting that, in marriage cases, a court does not have to articulate all the factors it considered in setting maintenance). Indeed, the court asserted it considered "all the evidence." Putting aside the fact that both businesses had no equity value when the marriage was dissolved, which would suggest there might really be no assets to award petitioner for either business, the evidence specifically indicated ShaZam Racing's income came from the PPP, which may (or may not) be considered income. Compare *Herbert v. Joubert*, 83 Va. App. 592, 609 (2025) (holding PPP loans should be included in assessing income for purposes of calculating presumptive child support), with *In re Marriage of Schumway*, 2023 WL 12061320, at * 4 (Colo. App. Apr. 20, 2023) (concluding that the mother's PPP loan was not part of her gross income for purposes of setting child support). Because petitioner has put forth no authority suggesting PPP funds are considered income in Illinois in setting child support and maintenance, we will not conclude they are here. See *In re Marriage of Baumgarter*, 237 Ill. 2d 468, 474-75 (2010) (" '[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' ") (quoting *Pecora v. Szabo*, 109 Ill. App. 3d 824, 825-26 (1982)). As such, we conclude the trial

court did not abuse its discretion in calculating respondent's income.

¶ 57                                2. *Other Preliminary Matters*

¶ 58        Petitioner also argues in her reply brief respondent conceded or forfeited issues by (1) failing to respond to petitioner's arguments, (2) not properly citing the record, and (3) relying on unpublished opinions in support of his arguments.

¶ 59        Although petitioner argues in her reply brief respondent failed to respond to several arguments she raised, we determine that only the following claims were not addressed: whether the trial court denied petitioner access to her e-mail, the court abused its discretion when it did not allow in evidence proof of respondent's 2023 income, and the court showed extreme favoritism toward respondent. The record shows petitioner has not shown *prima facie* reversible error regarding these claims. See *Thomas*, 395 Ill. App. 3d at 577. Regarding petitioner's e-mail, the record reflects petitioner was at least partly responsible for the rule prohibiting former employees from accessing their work e-mail once their employment was terminated. Moreover, she was given opportunities to obtain information contained in her e-mail and, apparently, she failed to act. As to respondent's 2023 income, the case had been pending in court for several years when petitioner asked the court for a continuance to obtain this evidence. Nothing prevented the court from denying a continuance to prevent further delays, especially when petitioner could move postdissolution for a modification of child support or maintenance based on a substantial change in circumstances. See *In re Marriage of Reynard*, 378 Ill. App. 3d 997, 1006 (2008) (this court suggested, to modify maintenance or child support, both an increase in the obligor spouse's income and the obligee spouse's or child's needs must be shown because, otherwise, without a showing of real need, there would be no " 'clean break' that is desirable with the dissolution of a marriage"). Concerning the court's alleged favoritism, nothing in the

record supports petitioner's contention. Instead, the record shows the court took great pains to ensure it was entering an equitable judgment.

¶ 60          As to the remaining matters, regarding respondent's lack of citation to the record and reliance on unpublished decisions, we admonish the parties that the Illinois Supreme Court rules are not mere suggestions but have the force of law and must be followed. *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 37. However, any violations that may have occurred in the briefing of this case do not hinder our review. *Id.*

¶ 61          B. Marital Property, Nonmarital Property, and the Valuation of Property

¶ 62               1. *Is Running Central Marital or Nonmarital Property?*

¶ 63          "Before disposing of property upon a dissolution of marriage, the trial court must first classify the property as marital or nonmarital." *In re Marriage of Gattone*, 317 Ill. App. 3d 346, 351 (2000). "A reviewing court will not disturb the trial court's classification unless it is contrary to the manifest weight of the evidence." *Id.* A classification is contrary to the manifest weight of the evidence "when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 64          "Pursuant to section 503(b)(1) of the *** Act (750 ILCS 5/503(b)(1) (West 1998)), there is a rebuttable presumption that all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage, including nonmarital property transferred into some form of co-ownership between the spouses, is marital property." *Gattone*, 317 Ill. App. 3d at 351-52. "A party may overcome this presumption by showing by clear and convincing evidence that the property falls into one of the categories listed in section 503(a) of the Act (750 ILCS 5/503(a) (West 1998))." *Id.* at 352. One of these categories, which, if proven,

results in the property being deemed nonmarital property, is "property acquired in exchange for property acquired before the marriage." 750 ILCS 5/503(a)(2) (West 2024).

¶ 65　　　　Here, respondent bought Running Central with Ian before the parties were married. After the parties were married, respondent exchanged his interest in the White family trust for Ian's interest in Running Central. Once that transaction was complete, respondent was the sole shareholder of Running Central. Although respondent acquired the entirety of the business after the parties' marriage, respondent was able to do so with property he acquired before the marriage, *i.e.*, his interest in the White family trust. Thus, only respondent's nonmarital property was used to purchase the business. See *id.*

¶ 66　　　　Petitioner argues Running Central was transmuted into marital property because (1) her name was on a loan document, which stated she owned half of the business; (2) without her good credit, the parties would not have obtained any loans to improve Running Central; (3) she personally guaranteed the SBA loan; and (4) funds from the parties' joint checking account were used to bankroll the business. "Property designated as nonmarital under section 503(a) may still be presumptively transmuted into marital property by an affirmative act of the contributing spouse, such as placing nonmarital property in joint tenancy or some other form of co-ownership with the other spouse." *Gattone*, 317 Ill. App. 3d at 352. "This raises the presumption that the contributing spouse made a gift of the property to the marital estate." *Id.* "The contributing spouse may overcome this presumption by presenting clear and convincing evidence that he or she did not intend to make a gift of the nonmarital property." *Id.* In doing so,

> "[s]ome of the significant factors for determining whether a party has successfully rebutted the presumption of a gift include (1) the size of the gift relative to the entire estate; (2) who paid the purchase price, made improvements,

paid taxes on the property with solely acquired funds, and exercised control and

management over the property; (3) when the asset was purchased; and (4) how the

parties handled their prior financial dealings with each other." *Id.*

"Any doubts as to the nature of the property are resolved in favor of finding that the property is

marital." *Id.*

¶ 67        Here, the business comprised a large part of the parties' estate, but, as noted

above, respondent purchased it with his own property. Respondent was the president of the

business and remained working at the store after petitioner reduced her hours. In October 2013,

the parties contracted to buy the Water Street property, using some money from their joint

account—an account respondent opened and added petitioner's name to only after the parties

were married—as a down payment. Two months later, respondent received his first of two

sizeable settlement payments from his parents' wrongful death case. He put all the settlement

monies into the joint bank account. Other funds going into the account included paychecks, but

petitioner herself, who had reduced her hours in 2012, one year before the parties bought the

Water Street property, was unable to say whose they were. Although the parties paid family bills

out of the account, this is insignificant compared to the almost $650,000 ($250,000 less than

respondent's entire settlement) withdrawn from the account in the following six months to

maintain, improve, and expand Running Central. Respondent made clear he had no intention of

sharing the settlement with petitioner, and he did not, on any forms other than the loan

documents, indicate he gave a portion of the business to petitioner or petitioner otherwise had

any interest in the business. His intent is both material and probative. See *In re Marriage of*

*Smith*, 265 Ill. App. 3d 249, 252 (1994) ("Proof of the transferring spouse's intent is relevant, if

not critical, in determining whether the presumption [of marital property] has been rebutted.").

¶ 68 Although petitioner believed there was an "understanding" she had an interest in Running Central, she admitted there was no mutual agreement, whether oral or written, establishing she had any interest in the business at all. While petitioner guaranteed a loan taken out to improve and expand the business, she, unlike respondent, did not put up any collateral to secure the loan. Her guarantee alone is simply not enough to transmute Running Central into marital property. See *Drennan v. Drennan*, 93 Ill. App. 3d 903, 907 (1981) (providing that the wife's signing of a mortgage note to execute a mortgage on a home and land the husband bought before the parties' marriage "is insufficient to constitute a transmutation of nonmarital property into marital property"). Running Central, which, again, respondent procured with his own property, paid rent to 414 Holdings, which used that money to pay down the loans. Although some marital funds might have been used to obtain the Water Street property, Running Central did not become marital property simply because of that. See *In re Marriage of Werries*, 247 Ill. App. 3d 639, 643 (1993) (noting significant repayment of loan during the marriage did not transmute a hog farm the husband had before the marriage into marital property).

¶ 69 Citing *In re Marriage of Demar*, 385 Ill. App. 3d 837, 851 (2008), petitioner maintains the parties' funds were so commingled that the money used to maintain, improve, and expand Running Central became marital funds, and thus, the business was transmuted into marital property. In *Demar*, the parties each (1) owned stock in a company they started, (2) sold their respective shares, and (3) had their capital gains combined in one check that was deposited in their joint account, which already contained substantial marital funds. *Id.* at 850. Thereafter, amid buying various houses and refinancing their primary residence, the husband used money from the parties' joint account to buy other jointly titled investments through a jointly titled securities account, the proceeds from which he placed in another account that already held

substantial marital assets. *Id.* at 851. The husband then took funds from this second marital account, bought stock in a vision correction company, and eventually sold that stock at a large profit, depositing the capital gains in a new account he opened in his name only. *Id.* at 841, 850-51. Thereafter, the husband used the money in his own account to purchase other investments. *Id.* at 851. As to the funds in the husband's individual account, the appellate court determined, by the time the marriage had dissolved, the funds had been used to purchase other investments. Thus, newly created assets came into being. "Once marital and nonmarital funds are commingled and lose their identity through acquisition of newly created assets during the marriage, the assets are marital." *Id.*

¶ 70          Here, unlike in *Demar*, there is no selling of separate stock belonging to each party, depositing of capital gains from that stock in an account that already had a substantial amount of marital funds, and repeatedly purchasing new assets with money from a joint account holding marital funds before depositing capital gains in an account held by only one of the parties. Indeed, here, even according to the deposits and withdrawals petitioner cites in her brief, most, if not all, the money coming in and going out of the parties' joint account was respondent's.

¶ 71          Petitioner's reliance on *In re Marriage of Kennedy*, 94 Ill. App. 3d 537 (1981), is also unpersuasive. There, the husband owned several music stores before the parties' marriage. *Id.* at 547. To expand the business, the wife and husband personally guaranteed a loan. *Id.* at 548. The appellate court found the stores the husband owned before the marriage were his nonmarital property, even if the wife's efforts improved the husband's business. *Id.* at 547 (determining that under section 503(c)(1) of the Act (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)(1)), "it is possible for one spouse to improve the other spouse's non-marital property without making that property

marital"). Likewise, the court observed, even though the husband's nonmarital music stores were worth more after the marriage, "the increase in value of non-marital property is non-marital property." *Id.*

¶ 72 Here, as in *Kennedy*, Running Central was respondent's nonmarital property, regardless of the fact petitioner, who was paid for her contributions to the business, helped improve the business and it became more profitable before the parties' marriage was dissolved. See *In re Marriage of Landfield*, 209 Ill. App. 3d 678, 694-95 (1991) (stating a business owned by one spouse prior to the parties' marriage is nonmarital and retains its nonmarital classification despite a significant increase in its value during the marriage, and if a contributing spouse's salary is found to be reasonable for the efforts contributed, the nonmarital business need not reimburse the marital estate because the contributing spouse's salary during marriage is marital property, and thus, the marital estate has already been compensated). Moreover, the fact petitioner, like the wife in *Kennedy*, guaranteed a loan to buy the Water Street property and expand Running Central does not automatically make Running Central marital property.

¶ 73 Petitioner asserts the fact respondent's settlement money used to improve Running Central remained in the joint account for years somehow necessitates a finding Running Central became marital property. This argument is irrelevant. In our view, how long the settlement money remained in the parties' joint account has absolutely no bearing on whether Running Central was transmuted into marital property. Again, as observed in *Kennedy*, even assuming the settlement money used to improve Running Central became marital (a conclusion we do not make), neither the use of that money to expand the business nor the increase in value to the store because of it necessarily transmuted Running Central into marital property. See *id.*; see also 750 ILCS 5/503(a)(7) (West 2024) (providing that nonmarital property includes "the

increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise").

¶ 74    To the extent petitioner suggests the settlement money became marital property because it remained in the joint account for years, we note it is not the length of time nonmarital funds remain in a marital account that transmutes nonmarital assets into marital assets. Instead, "[i]n order to be transmuted, the nonmarital funds must be commingled with marital funds '*resulting in a loss of identity* of the contributed property.' " (Emphasis in original.) *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 79 (quoting 750 ILCS 5/503(c)(1) (West 2012)). Transmutation of nonmarital funds "depends on the specific history of those funds, not on respondent's general treatment of the *** account." *In re Marriage of Steel*, 2011 IL App (2d) 080974, ¶ 72. "That nonmarital funds were deposited into a marital account does not establish beyond question that the funds were transmuted into marital property." *Id.*

¶ 75    Here, respondent testified he had no intention of sharing the settlement money with petitioner, the vast majority of which was used to improve Running Central. In looking at the history of the funds, we believe the settlement money did not lose its identity as nonmarital property simply because it was deposited in the parties' joint account.

¶ 76    2. *Whether 414 Holdings Was Properly Awarded to Respondent*

¶ 77    The parties agree, as the trial court found, 414 Holdings is marital property. They disagree about whether 414 Holdings should have been awarded to respondent. Petitioner claims the court should not have given 414 Holdings to respondent simply because respondent is the sole owner of Running Central. Respondent asserts he was rightly given 414 Holdings, because Running Central could not operate profitably if petitioner controlled its operating company,

despite the businesses being separate. We agree.

¶ 78        "Marital property," in simplest terms, means "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage." 750 ILCS 5/503(a) (West 2024). " 'The touchstone of proper and just apportionment is whether it is equitable in nature,' which does not require mathematical equality." *In re Marriage of Thornley*, 361 Ill. App. 3d 1067, 1071 (2005) (quoting *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 778 (1998)).

¶ 79        Section 503(d) of the Act (750 ILCS 5/503(d) (West 2024)) requires the trial court to divide marital property in "just proportions considering all relevant factors." These relevant factors include the contributions of each party, the value of the property awarded to each spouse, the duration of the marriage, the relevant economic circumstances of each spouse, and the reasonable opportunity of each spouse to acquire future assets and income. *Id.* §§ 503(d)(1), (3), (4), (5), (11). The court should also consider "whether maintenance is *** to be awarded." *In re Marriage of Hart*, 194 Ill. App. 3d 839, 846-47 (1990).

¶ 80        "We will not reverse a trial court's distribution of marital property absent a clear abuse of discretion." *In re Marriage of Katsap*, 2022 IL App (2d) 210706, ¶ 137. "An abuse of discretion occurs when the decision was clearly against logic." (Internal quotation marks omitted.) *In re Marriage of McLean*, 2025 IL App (5th) 250094, ¶ 49. In other words, we consider "whether the trial court made an arbitrary decision, without using conscientious judgment, or whether, in view of all of the circumstances, the trial court overstepped the bounds of reason, ignored the law, and thereby caused substantial prejudice to the appellant." (Internal quotation marks omitted.) *Id.*

¶ 81        Here, the marital property the trial court awarded petitioner included the marital

home, with an equity value of $126,363.39. Although the court did not award petitioner reimbursement for the money she spent on the mortgage, that seems equitable, as petitioner was allowed to remain in the house during the dissolution proceedings. The record does not indicate how much she paid in property taxes or when these payments were made. The court also awarded petitioner child support of $5,974, excluding the $52 per month until either the parties' daughter turns 18 or graduates from high school, and maintenance of $424 for four years and eight months, *i.e.*, $23,744 in total. The marital property the court awarded respondent was 414 Holdings, which was valued at $375,000 and had an equity value of $74,278.74. Although the court also gave respondent Running Central, his nonmarital property with an equity value of $1 million, we cannot conclude awarding respondent 414 Holdings was an abuse of discretion. As respondent suggests, awarding petitioner 414 Holdings with respondent trying to keep Running Central profitable would create problems for both businesses, especially given, as the court observed, the "case has been fraught with animosity and contentious behavior." If the parties could not cooperate in court, it goes without saying they could not work together in running a business when the court was not watching.

¶ 82     Instructive on that point is *Kennedy*. There, the husband acquired more music stores after the parties were married. *Kennedy*, 94 Ill. App. 3d at 547. Regarding these stores acquired after the marriage, the appellate court found they were marital property and properly awarded to the husband. *Id.* at 548. The court explained:

> "Although some of [the husband's] shares, representing his interest in the
> new stores, are marital property, it was proper to award all the stock to [the
> husband] so as to avoid future friction over the conduct of the business. The issue
> is whether the property awarded to [the wife] represents a 'just proportion' of the

value of the marital estate, including the new stores." *Id.*

Here, 414 Holdings, like the new music stores in *Kennedy*, was deemed marital property by the trial court. Awarding 414 Holdings to respondent was not an abuse of discretion given, like in *Kennedy*, that decision was necessary "to avoid future friction over the conduct of the business." *Id.*

¶ 83                                   3. *Whether ShaZam Racing Was Worth $0*

¶ 84            Petitioner argues, based on documents submitted after the final judgment for dissolution of marriage was entered, that ShaZam Racing is worth $750,000. She argues she should be entitled to a portion of this equity value assessed postdissolution. We disagree. The date the trial court entered its bifurcated judgment dissolving the parties' bounds of matrimony is the proper date for the valuation of marital property. See *In re Marriage of Mathis*, 2012 IL 113496, ¶ 30. When that order was entered in November 2024, ShaZam Racing was not worth anything. The fact ShaZam Racing was purportedly worth more later is immaterial.

¶ 85            Regarding these property issues, this court concludes Running Central was respondent's nonmarital property, having never been converted into marital property. The marital property was equitably divided, with respondent receiving 414 Holdings. Finally, ShaZam Racing was properly valued at $0, which is the equity value it had when the bifurcated judgment dissolving the marriage was entered.

¶ 86                    C. Running Central's Retained Earnings and Distributions

¶ 87            The parties disagree about whether the retained earnings and distributions of Running Central, an S corporation, are income for purposes of calculating child support and maintenance. When the trial court awarded petitioner temporary child support and maintenance, it found the retained earnings and distributions were income. The temporary awards, which were

substantial, reflected this. After hearing from Schmidt, an expert in business accounting in general and Running Central specifically, the court found the retained earnings and distributions were not income for purposes of calculating child support and maintenance. The court gave respondent credit for overpayment based on the temporary calculations. Thus, the court set child support and maintenance at a much lower amount and ordered that respondent receive credit for his overpayment under the temporary order. The task before us is to determine whether the trial court erred in excluding the Running Central retained earnings and distributions from respondent's income for purposes of calculating child support and maintenance in the final judgment.

¶ 88        In reviewing this issue, we note " 'income' has the same meaning with regard to maintenance and child support" and includes all of a party's revenue from all sources. *In re Marriage of Dahm-Schell*, 2021 IL 126802, ¶ 39. "[A] variety of payments will qualify as 'income' for purposes of *** the Act that would not be taxable as income under the Internal Revenue Code." *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004). This is because the "Internal Revenue Code is designed to achieve different purposes than our state's *** support provisions." *Id.* It makes sense that the opposite is also true; just because the Internal Revenue Code has defined a revenue stream as taxable income does not mean it is income for purposes of calculating child support and maintenance under the Act. See *id.*

¶ 89        A trial court's conclusion regarding a party's net income for purposes of calculating child support and maintenance is reviewed under an abuse-of-discretion standard. *In re Marriage of Moorthy*, 2015 IL App (1st) 132077, ¶ 65. A court abuses its discretion when no reasonable person would adopt the court's position. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005).

¶ 90    With this in mind, we turn to the issues at hand.

¶ 91    1. *Whether the Retained Earnings Were Income*

¶ 92    We first address whether retained earnings are income for purposes of assessing child support and maintenance. "Although a Subchapter S corporation may distribute income, it is not required to do so." *In re Marriage of Brand*, 273 Kan. 346, 351 (2002). "[A]ccumulate[d] [and undistributed] profits[ are] referred to as 'retained earnings.' " *Id.* "Retained earnings are the net sum of a corporation's yearly profits and losses," and "are owned by the corporation, not by the shareholders." *Id.*

¶ 93    When determining whether retained earnings are income for purposes of child support and maintenance, courts should engage in a case-by-case, fact-specific analysis. *Moorthy*, 2015 IL App (1st) 132077, ¶ 64. In doing so,

> "[r]elevant factors *** include: (1) the extent of the obligor's ownership share in the corporation, (2) the obligor's ability to decide whether corporate earnings should be retained or distributed, (3) the corporation's history of retained earnings and distributions, in comparison to postdivorce corporation activities, (4) whether the retained earnings are excessive, and (5) whether there is evidence that income is actually being manipulated." *Id.*

"[H]eightened scrutiny is appropriate when the obligor has the power to control distributions, but this, in itself, is not dispositive of whether a subchapter S corporation's retained earnings must be included in an obligor's income." *Id.* This is because "it is sometimes necessary for a corporation to retain profits in order to secure its continued existence and appropriate capitalization to meet ongoing business necessities." *Id.* "Indeed, it would be unfair to the obligor to include in the calculations of income *** the retained earnings necessary for the continuing viability of a

- 34 -

corporation[, which is] not available to the obligor." *Id.*

¶ 94       Here, the first two factors may weigh in favor of concluding the business's retained earnings are income for purposes of calculating child support and maintenance. That is, it is undisputed respondent is the sole owner of Running Central, and as the sole owner, he alone decides whether the business's earnings are retained or distributed. However, the last three factors certainly establish Running Central's retained earnings should not be used in calculating child support and maintenance. In 2020, prior to the dissolution of the parties' marriage, the business's retained earnings were given to the parties to spend. This had catastrophic consequences for Running Central. The business was on the verge of bankruptcy because the retained earnings were not being used to pay for and replenish inventory. Vendors stopped not only offering Running Central a volume discount, but they refused to send the business any product. As a result, respondent was purchasing shoes for customers online in ways customers could have easily done themselves. Running Central realized no financial profit from this tactic. While the dissolution proceedings were ongoing, respondent used financial relief afforded to Running Central because of COVID-19 to pay off debt and get the business current with vendors. Schmidt, who had extensive knowledge of the business, testified respondent's income after taking advantage of this relief was satisfactory or even a little high if Running Central was going to remain profitable. He also found the business's substantial retained earnings were not excessive. His testimony concerning what salary respondent could afford to pay himself while keeping the retained earnings to pour back into the business and make it not only sustainable but profitable was particularly persuasive. See *id.* ¶ 67 ("[E]xpert testimony may be helpful and relevant in establishing 'the level of retained earnings that are appropriate for the corporation to carry on its intended purpose.' ") (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 358 (Tenn. 2005)).

Finally, nothing in the record indicates respondent's income was being manipulated. The difference between respondent's salary before 2020 and after is solely attributable to maintaining a healthy business by pouring money back into it instead of running it into the ground.

¶ 95 Petitioner argues, because the first two *Moorthy* factors favored a finding the retained earnings were income for purposes of calculating child support and maintenance, this case should be subject to heightened scrutiny. We disagree. Although it is true respondent was the sole owner and alone decided what monies were to be retained, those factors alone are not dispositive because there may be, as there is here, a valid reason for not distributing retained earnings. See *id.* ¶ 64.

¶ 96 Petitioner suggests the retained earnings should be used in assessing respondent's income because "[a]fter Running Central's accounting and tax errors were corrected, the company had more money than ever." The record belies this position. Although, after the errors were corrected in an amended return, Running Central realized a significant increase in profits, both Couri and Schmidt explained the increase in profits did not result in respondent's income increasing or more money being available in the business's bank account. Schmidt made it clear respondent would have less available income because of taxes and penalties he would have to pay because of the errors.

¶ 97 Petitioner relies on *In re Marriage of Lundahl*, 396 Ill. App. 3d 495 (2009), to argue Running Central's retained earnings were income to respondent. There, the husband was awarded all his nonmarital property, which included the retained earnings from an S corporation. *Id.* at 497-98. After the parties moved the trial court to reconsider, the court reclassified the retained earnings as marital property, and the appellate court affirmed, finding:

"[I]n the case at bar, the retained earnings of [the husband's company] were not

held by the corporation to pay expenses. They were not used to pay dividends, nor were they used in connection with the corporation. Additionally, they were taxed to [the husband] who paid the income tax on the earnings. Accordingly, we find that the retained earnings constituted [the husband's] income." *Id.* at 504.

¶ 98　　　　Here, unlike in *Lundahl*, Running Central's retained earnings paid, among other things, employees' salaries, utilities, rent, and vendors of its products. Moreover, unlike in *Lundahl*, the retained earnings were not taxed to respondent as income tax. Instead, the pass-through taxes Running Central paid, though listed on respondent's income tax return, were a tax on the business's profits, not respondent's income. See *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010, 1019 (2009) (stating retained earnings of an S corporation become income when disbursed to the shareholder in the form of *dividends*).

¶ 99　　　　Finally, petitioner claims respondent's retained earnings should be considered income because not doing so "allow[s] S Corporation owners to defraud the marital estate by simply waiting out the divorce proceedings." Although this is a potential concern when assessing income sources under *Moorthy,* there is nothing in the record to suggest it has occurred in this case.

¶ 100　　　　　　　　　　2. *Whether the Distributions Were Income*

¶ 101　　　　We now consider the other side of the proverbial coin, *i.e.*, whether the distributions respondent received from Running Central should be considered income. "A Subchapter S corporation allocates various items of income to shareholders based upon the shareholder's proportionate ownership of stock." *Brand*, 273 Kan. at 351. "Taxable income of a Subchapter S corporation which is attributable to a shareholder does not reflect actual income received as a cash distribution." *Id.* at 356. Thus, "[t]here is no presumption that an individual's

share of a Subchapter S corporation's income should be included as income for purposes of calculating *** support." *Id.* Instead, "[i]ndividual inquiry on a case-by-case basis is necessary to ensure that the appropriate amount of income is considered 'received' when determining *** ['i]ncome' for the self-employed." *Id.* This is because "the calculation of income is highly fact specific." *Id.* "Few courts rely solely on personal income tax returns to determine the amount of income available for purposes of calculating support." *Id.*

¶ 102      Here, for the same reasons noted above in the discussion about retained earnings, we conclude the distributions Running Central made to respondent are not income for support purposes. Running Central was in dire straits before petitioner sought to dissolve the marriage. Respondent took advantage of COVID-19 financial relief to lead the business out of potential bankruptcy and make it profitable. Part of that included paying his quarterly pass-through taxes. Schmidt explained the distributions respondent received to pay taxes were not income available to respondent for his personal use. Respondent confirmed this, asserting that from 2020 to 2023, the distributions he received went to pay the amount of taxes he owed "to the penny." See *Moorthy*, 2015 IL App (1st) 132077, ¶ 68 (noting money distributed from S corporation to shareholder to pay taxes was not income for purposes of calculating support). Although it is true respondent used distribution money at other times for personal things, for example to buy a piano for the parties' daughter, this does not necessitate a finding the distributions were income for support purposes. See *id.* ¶¶ 12, 68 (appellate court was not persuaded to find distributions were income for support purposes when the obligor used $7,000 in distributions from his company to pay pass-through taxes to, instead, buy plane tickets).

¶ 103      In arguing the distributions respondent received were income, petitioner makes much of the increase in distributions after the amended tax return was prepared, suggesting this

increase was income for support purposes. We disagree. Schmidt and Couri explained the amended return showed an increase in profits for Running Central, which, in turn, led to an increase in pass-through taxes respondent had to pay. Both Schmidt and Couri made clear the increase did not result in an increase in respondent's income.

¶ 104    Accordingly, as neither the retained earnings nor the distributions constituted income, the trial court acted within its discretion in awarding petitioner child support and maintenance in the amounts specified in the final judgment.

¶ 105                          D. Indirect Civil Contempt

¶ 106    The last issues we address are whether (1) we have jurisdiction over the appeal from the order finding petitioner in indirect civil contempt and (2) an award of attorney fees is proper when petitioner purged the contempt. (In considering this issue, we do not address petitioner's reply brief alleging deficiencies in respondent's brief, as we consider these complaints unavailing.) Putting aside the issue of whether petitioner's motion to enter an amended indirect civil contempt finding is a proper posttrial motion given, among other things, a sanction of attorney fees had already been entered (see 735 ILCS 5/2-1203(a) (West 2024)), we conclude we lack jurisdiction because the appeal is moot.

¶ 107    "The existence of a real controversy is an essential prerequisite to appellate jurisdiction." *In re Estate of Wellman*, 174 Ill. 2d 335, 353 (1996). "When 'intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party' [citation], then the appeal, and issues therein, are considered moot." *Felzak v. Hruby*, 226 Ill. 2d 382, 392 (2007). One such intervening event arises when a finding of contempt has been purged by the contemnor. *In re Marriage of Betts*, 155 Ill. App. 3d 85, 104 (1987). A contempt order is purged, and thus, an appeal from that order is considered moot, when the conditions of

the contempt order are satisfied by the party held in contempt. See *id.* (providing compliance with the purging provision renders contempt argument moot); see also *J.S.A. v. M.H.*, 384 Ill. App. 3d 998, 1010 (2008) (noting an appeal of contempt finding against the respondents for their failure to submit to DNA testing was moot, as contemnor submitted to DNA testing and purged the finding of contempt); *In re Keon C.*, 344 Ill. App. 3d 1137, 1148 (2003) (observing that paying the entire arrearage and providing a copy of the insurance card, as required in the contempt order, purged these issues and rendered the contempt moot). "We review *de novo* whether a case is moot." *Turner v. Joliet Police Department*, 2019 IL App (3d) 170819, ¶ 12.

¶ 108    Here, petitioner was held in indirect civil contempt because she did not complete the personal financial statement respondent needed to refinance the property awarded to him and remove petitioner's name from the loan documents. Fourteen days after she was held in contempt, petitioner filed the personal financial statement at issue. At that time, she satisfied the conditions of the contempt order, and thus, her appeal is moot. There is nothing to be accomplished now by reversing the trial court's purge order to review the underlying decision. See *Betts*, 155 Ill. App. 3d at 104 (where the nonpayment of child support was the basis for the contempt order, actual payment of the entire amount owed rendered the issue moot, as there was nothing to be accomplished by reversing the purge order). The fact that the provision in the amended judgment dissolving the marriage may (or may not) have required petitioner to complete a personal financial statement is immaterial now.

¶ 109    That said, we observe "[a] reviewing court will review a technically moot question *** when [it] falls within one of the three recognized exceptions to the mootness doctrine: (1) the public-interest exception, (2) the capable-of-repetition exception, and (3) the collateral-consequences exception." *In re Christopher C.*, 2018 IL App (5th) 150301, ¶ 13.

Petitioner has not argued any of these exceptions apply. Accordingly, we will not consider whether, though moot, the indirect civil contempt finding is reviewable under one of the three exceptions. See *Country Mutual Insurance Co. v. Styck's Body Shop, Inc.*, 396 Ill. App. 3d 241, 254-55 (2009) (" 'A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error.' ") (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)).

¶ 110       In concluding the appeal from the indirect civil contempt order is moot, we observe the trial court entered an order for attorney fees. Neither party addresses on appeal the propriety of the award for fees or how, if at all, the fee award is impacted by the fact petitioner purged the contempt. To the extent the attorney fee award is reviewable given these facts and our conclusion the appeal is moot, we hold the court's decision to grant fees was not an abuse of discretion. See *Schneider*, 214 Ill. 2d at 174.

¶ 111       Section 508(b) of the Act (750 ILCS 5/508(b) (West 2024)) provides:

> "In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party. If non-compliance is with respect to a discovery order, the non-compliance is presumptively without compelling cause or justification, and the presumption may only be rebutted by clear and convincing evidence. If at any time a court finds that a hearing under this Act was precipitated or conducted for

any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation."

¶ 112       Here, the trial court found petitioner in contempt for violating the provisions of the amended judgment for dissolution of marriage, and it ordered petitioner to pay respondent's attorney fees incurred in bringing the contempt petition. Implicit in the contempt finding was the court's determination that petitioner's failure to comply with the provisions of the amended judgment for dissolution of marriage was without cause or justification. See *In re Marriage of Putzler*, 2013 IL App (2d) 120551, ¶ 38. The court's finding of contempt is sufficient to require an award of fees under section 508(b) of the Act. *In re Marriage of Davis*, 292 Ill. App. 3d 802, 811 (1997).

¶ 113       In concluding the award of attorney fees was proper, we note it does not matter that the trial court found petitioner had purged the contempt by completing the personal financial statement. See *In re Marriage of Wassom*, 165 Ill. App. 3d 1076, 1081 (1988). The policy behind section 508(b) is to eliminate or lessen the financial burden on the party that is compelled to seek enforcement. *Id.* Respondent incurred attorney fees to enforce the provision in the amended judgment for dissolution of marriage. Therefore, respondent was entitled to attorney fees at the time the court granted him relief by enforcing the provisions of the amended judgment for dissolution of marriage. The later purge order did not excuse petitioner from the obligation imposed by section 508(b). *Id.*

¶ 114       Because petitioner complied with the trial court's purge order, an appeal concerning the merits of the court's finding of contempt is moot. Moreover, the court's award of

section 508(b) attorney fees against petitioner was not an abuse of its discretion, irrespective of the fact petitioner purged the contempt.

¶ 115                                   III. CONCLUSION

¶ 116          For the reasons stated, we affirm the trial court's judgment.

¶ 117          Affirmed; motion taken with case granted.